Opinion
 

 STANIFORTH, J.
 

 Helen M. McGee sought damages from John Hedger and Cessna Aircraft Company for personal injuries she sustained in the crash of a 1968 model 177 Cardinal Cessna aircraft. The aircraft was manufactured by Cessna and owned by Hedger. McGee settled her claim, dismissed her complaint, as to defendant Hedger before commencement of the trial. As to the remaining defendant Cessna, McGee asserted two theories of liability. First, McGee charged negligence in the design of the aircraft and second design defects of the aircraft renders Cessna strictly liable for injuries caused proximately thereby. More specifically, McGee asserted the fuel system of the aircraft was inherently unsafe; Cessna designed, installed near the cockpit an “accumulator” of gasoline intercepting its flow from the storage tanks in the wings to the carburetor and the engine in the nose of the plane.
 

 McGee complains that Cessna knew the nosewheel strut was susceptible to deformation either in a crash or due to rough handling; the nosewheel strut collapsed, telescoped, upon impact and ruptured the accumulator tank, permitting fuel to escape in an area where combustion would and did in fact occur, thus causing the second accident—a post-crash fire. Cessna denied the allegations and raised the affirmative
 
 *1008
 
 defenses of contributory negligence, assumption of risk and misuse of the product. The jury returned a verdict in favor of defendant Cessna. After denial of her motion for a new trial, McGee appealed.
 

 Facts—The Crash
 

 McGee was injured in a crash of the Cessna aircraft which occurred shortly after the aircraft left the ground on takeoff from Warner Springs Airport, San Diego County, March 28, 1971. Four persons were seated in the aircraft at the time of the crash. McGee was in the left front seat; Hedger, the owner of the plane, was in the right front seat; Dorothy Watts and Virginia Renn occupied the two rear seats. Each occupant wore a seat belt; however, no shoulder harnesses were provided in the aircraft.
 

 The weather was clear; the aircraft took off on an easterly course of travel. After a short period of flight, the plane made a left turn to go in a northerly direction. After the turn the aircraft crashed on the hilly terrain. After the aircraft came in contact with the ground, the front of the aircraft burst into flames. The flames quickly entered the cockpit area under the control panel, burned on the left front side of the cockpit, and then spread throughout the entire aircraft.
 

 The two women in the rear seats remained conscious during and after the impact. No occupant suffered major injuries on the original crash. However, McGee and Hedger were rendered unconscious when thrown forward during the crash. The conscious, rear seat passengers quickly evacuated the burning aircraft and pulled the unconscious Hedger and McGee from the burning wreckage.
 

 McGee was the last to be removed from the aircraft and by the time she was extricated, she had suffered extensive third degree burns over both her legs. These burns were of such severity as to require amputation of her right leg three inches below the knee joint and the left leg six inches below the hip joint. McGee’s injuries are almost entirely the result of the post-crash fire.
 

 Facts—The Trial
 

 To support her claim of defective or negligent design of the Cessna aircraft relating to its performance and handling characteristics, as well as its crashworthiness, McGee relied upon the testimony of three expert
 
 *1009
 
 witnesses: Norman Horton, formerly associated with the University of Southern California; Dr. James Turnbow of Arizona State University; and Michael Antoniou, a test pilot. Defendant Cessna relied upon the testimony of three other expert witnesses: Prof. Karl Bergey of the University of Oklahoma; Dr. John Swearingen, a retired Federal Aviation Administration employee; and Mr. Bill Robinson, a test pilot, currently employed by Piper Aircraft Company.
 

 Mr. Antoniou testified to numerous deficiencies in the design of the subject aircraft as it relates to its performance and handling characteristics; however he was unable to establish a causal connection between these defects and the crash. Mr. Horton and Dr. Turnbow testified to design defects in the Cessna aircraft as it relates to crashworthiness—the incineration potential after
 
 a
 
 relatively minor initial crash. Each opined such deficiencies were a proximate cause of McGee’s injuries, though they did not contribute to the original cause of the crash.
 

 Concerning the crashworthiness issue, Horton and Turnbow testified the Cessna 177 aircraft had a fuel system which operated primarily on a gravitational flow principle. Specifically, the fuel in the aircraft was contained in the wings which were affixed to the top of the aircraft fuselage. A fuel line then carried the fuel through a fuel selector valve: This valve could be operated by persons in the cockpit so fuel can be taken from the right wing, the left wing or both at the same time. However,
 
 this valve cannot be positioned so as to stop the flow of fuel through the fuel lines as it does not have an offposition.
 

 From the fuel selector valve, the fuel line then proceeds to a fuel reservoir tank, identified during the trial as the “accumulator” tank. This tank is located on the passenger side of the firewall separating the passenger cockpit from the engine compartment. It rests immediately in front of the feet and legs of both the pilot and co-pilot controlling the aircraft. The top of the accumulator tank is part of the floor of the cockpit and is made of thin aluminum sheet metal. The fuel line proceeds from the accumulator through a shut-off valve located on the firewall into the carburetion system of the engine of the aircraft.
 

 The Cessna aircraft had a nonretractable nosewheel attached to the aircraft by means of a tubular metal strut. The nosewheel mechanism and attachments are in the immediate proximity of the engine of the aircraft and specifically the carburetion system on the engine. The same strut and attachments are also in immediate proximity to the firewall separating the
 
 *1010
 
 engine compartment from the cockpit and in fact attach near the fuel accumulator tank.
 

 The aircraft had, as standard equipment, lap type seatbelts but did not have shoulder harness as part of the standard equipment present when the aircraft was originally manufactured and sold.
 

 Horton and Turn bow opined when the aircraft struck the ground, it was in substantially level flight and under control. As a result of sliding along the ground the nosewheel strut collapsed dislodging the carburetor and rupturing the accumulator tank. The escaping fuel contacted various sources of ignition in the engine compartment and the fire, the second accident, occurred. They further testified because of the nature and design of the fuel system of this aircraft, all of the fuel in the tanks was available to feed the fire.
 

 On behalf of Cessna expert witness Robinson testified the handling and performance characteristics of the Cessna aircraft were as specified in the Cessna flight test data and in conformity with applicable Federal Aviation Regulations. Prof. Bergey and Dr. Swearingen testified to their opinion the design of the subject aircraft from a crashworthiness standpoint was neither defective nor negligent. Furthermore, Prof. Bergey and Dr. Swearingen stated that various design features criticized by McGee were not causally related to her injuries in the crash.
 

 The Instructions
 

 The instructions to be given the jury were in contention from the time of Cessna’s pretrial
 
 in limine
 
 motions to obtain a ruling from the trial judge as to whether the crashworthiness issue would be governed by rules of negligence or strict liability. The judge deferred his decision until after the presentation of the evidence; the court then determined to instruct the jury on liability for crashworthiness—the second accident—in accordance-with negligence concepts. The judge reasoned:
 

 “It is my opinion and I am going to so find that crashworthiness would be a matter of the exercise of care by a manufacturer in putting his product on the market so as to avoid any injury that might result in the use of the product in the event of a crash. And the more logical and realistic approach would be one of negligence and not strict liability.
 

 
 *1011
 
 “I think strict liability puts too much of an onus on the manufacturer. If the opinion that we rendered in this case holds up and the court did review it and finds that strict liability will be apportioned with contributory negligence, I don’t think it will matter much.
 

 “But for the purpose of this decision on this case, I am going to find that crashworthiness should be based on negligence and not strict liability.”
 

 The court charged the jury: “ ‘The plaintiff’s allegations of negligence against the defendant relate to her claims that the defendant was negligent in its manufacture or design of the subject aircraft with regard to its performance and handling characteristics as well as with regard to the issue of the aircraft’s being reasonably designed to avoid subjecting its users to an unreasonable risk of injury in the event of a foreseeable accident. This last negligence issue is sometimes known as “crashworthiness.” ’ ” and proceeded to instruct on negligence, not strict liability, concepts as the rules governing Cessna’s liability for the fire causing McGee’s injuries.
 
 [1]
 

 
 *1012
 
 The Law
 

 The court in
 
 Greenman
 
 v.
 
 Yuba Power Products, Inc.,
 
 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], imposed strict tort liability upon the manufacturer for a manufacturing or production defect where: “an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.”
 

 The court in
 
 Cronin
 
 v.
 
 J. B. E. Olson Corp.,
 
 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], extended strict liability doctrine for “manufacturing defects” of
 
 Greenman
 
 to “design defect.”
 
 Cronin
 
 involved an action based on the doctrine of strict liability brought against the seller of a bread delivery truck for injuries received when a hasp, whose purpose was to hold the bread trays in place, broke in a collision between the bread truck and another car. When the defective hasp broke, the tray hit the driver in the back, hurled him through the windshield. For the injuries he sustained in this “second” accident, Cronin sought recovery.
 

 Cronin
 
 took several distinct forward steps in the law of strict liability. First, the California Supreme Court for the first time imposed the doctrine of strict liability in a factual setting of “design defect.” The court stated at page 134: “We can see no difficulty in applying the
 
 Greenman
 
 formulation to the full range of products liability situations, including those involving ‘design defects.’ A defect may emerge from the mind of the designer as well as from the hand of the workman.”
 

 Second,
 
 Cronin
 
 extends this strict liability concept to cover responsibility for postcrash injuries—“second collision” injuries—resulting from a design defect which had no causal relation to the “first” accident. Thus the crashworthiness concept came into California law. Said the court at page 126: “Olson’s argument that the van was built only for ‘normal’ driving is unavailing. We agree that strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. Although a collision may not be the ‘normal’ or intended use of a motor vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. [Citations.] The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use.”
 

 
 *1013
 

 Cronin
 
 required a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties; to take reasonable precautions to minimize the harm that may result from misuse and abuse.
 
 The manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practicable to forestall particular crash injuries and mitigate the seriousness of others. (Pike
 
 v.
 
 Frank G. Hough Co.,
 
 2 Cal.3d 465, 473-474 [85 Cal.Rptr. 629, 467 P.2d 229];
 
 Thomas
 
 v.
 
 General Motors Corp.,
 
 13 Cal.App.3d 81, 89 [91 Cal.Rptr. 301];
 
 Self
 
 v.
 
 General Motors Corp.,
 
 42 Cal.App.3d 1 [116 Cal.Rptr. 575];
 
 Buccery
 
 v.
 
 General Motors Corp.,
 
 60 Cal.App.3d 533 [132 Cal.Rptr. 605].)
 

 Cronin
 
 is reaffirmed in
 
 Horn
 
 v.
 
 General Motors Corp.,
 
 17 Cal.3d 359 [131 Cal.Rptr. 78, 551 P.2d 398], where the Supreme Court again dealt with the propriety of applying rules of strict liability to a crashworthiness issue. Horn’s automobile struck an embankment and the second collision occurred when plaintiff’s face hit the center part of the steering wheel. Plaintiff charged the defective securing of the horn cap to the steering wheel resulted in an aggravation of her injuries. The case was tried on the single theory of strict liability of a defective product. The Supreme Court “consistent with our ruling in Cronin” approved the jury instruction to the
 
 effect:
 
 “[I]f the station wagon was defectively designed or manufactured in such a manner that the horn assembly caused plaintiff to sustain greater injuries in the collision than she would have otherwise sustained absent the defect, then the manufacturer and distributor of the vehicle would be liable to the extent of such aggravation of her injuries.”
 
 (Horn
 
 v.
 
 General Motors Corp., supra,
 
 17 Cal.3d 359, 366.)
 

 Third,
 
 Cronin
 
 held a plaintiff satisfies his burden of proof -under
 
 Greenman
 
 in both a manufacturing defect and a design defect context when (1) he proves the existence of a defect and (2) such defect was a proximate cause of his injuries.
 
 (Cronin
 
 v.
 
 J. B. E. Olson Corp., supra,
 
 8 Cal.3d 121, 133-134;
 
 Barker
 
 v.
 
 Lull Engineering Co.,
 
 20 Cal.3d 413, 427 [143 Cal.Rptr. 225, 573 P.2d 443].)
 

 Thus under the strict (or product) liability doctrine the injured plaintiff is not required to prove the manufacturer negligent. The effect of the
 
 Greenman
 
 decision as clarified by
 
 Cronin
 
 was to: “. . . dispense with negligence as the basis of recovery in defective products cases, to discard the fictions of warranty, and to replace them with absolute liability. ‘[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective
 
 *1014
 
 products that reach the market.’
 
 [Escola
 
 v.
 
 Coca Cola Bottling Co.,
 
 24 Cal.2d 453, 462 (150 P.2d 436).]”
 
 (Cronin, supra,
 
 p. 129.)
 

 Cronin,
 
 in holding the “unreasonably dangerous” language of section 402A, Restatement Second of Torts, inapplicable, not the law of California, stated:
 

 “Rather it has burdened the injured plaintiff with proof of an element that rings of negligence.
 

 “Yet the very purpose of our pioneering efforts in this field was to relieve the plaintiff from problems of proof inherent in pursuing negligence [citation] and warranty [citation] remedies, and thereby ‘to insure that the costs of injuries resulting from defective products are borne by the manufacturers. . . .’ ”
 
 (Cronin
 
 v.
 
 J. B. E. Olson Corp., supra,
 
 8 Cal.3d 121, 132-133.)
 

 Most recent and in point on the burden of proof question is
 
 Barker
 
 v.
 
 Lull Engineering Co., supra, 20
 
 Cal.3d 413, 431-432: “Although our cases have thus recognized a variety of considerations that may be relevant to the determination of the adequacy of a product’s design, past authorities have generally not devoted much attention to the appropriate allocation of the burden of proof with respect to these matters. [Citations.] The allocation of such burden is particularly significant in this context inasmuch as this court’s product liability decisions, from
 
 Greenman
 
 to
 
 Cronin,
 
 have repeatedly emphasized that one of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action. Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product’s design under the ‘risk-benefit’ standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we
 
 conclude that once the plaintiff
 
 makes a
 
 prima facie showing that the injury was proximately caused
 
 by the
 
 product's design,
 
 the
 
 burden should appropriately
 
 shift to the
 
 defendant to prove, in light of the relevant factors, that the product is not defective.
 
 Moreover, inasmuch as this conclusion flows from our determination that the fundamental public policies embraced in
 
 Greenman
 
 dictate that a manufacturer who seeks to escape liability for an injury proximately caused by its product’s design
 
 *1015
 
 on a risk-benefit theory should bear the burden of persuading the trier of fact that its product should not be judged defective, the defendant’s burden is one affecting the burden of proof, rather than simply the burden of producing evidence. [Citations.]” (Italics added.)
 

 Fourth,
 
 Cronin
 
 laid to rest the requirement, in the context of a strict liability action, the defect must make the product “unreasonably dangerous.” The doctrine “crept into our jurisprudence without fanfare after its inclusion in section 402A of the Restatement Second of Torts.”
 
 (Cronin
 
 v.
 
 J. B. E. Olson Corp., supra,
 
 8 Cal.3d 121, 129.) The Supreme Court held the Restatement language “in practice rarely leads to a different conclusion than would have been reached under laws of negligence. . . . Yet the very purpose of our pioneering efforts in this field was to relieve the plaintiff from problems of proof inherent in pursuing negligence . . . .”
 
 (Id.,
 
 at p. 133.) Such a rule would require proof (1) the product is defective and (2) unreasonably dangerous. Such a requirement would “significantly increase” the burden of a plaintiff and represents a “step backward.”
 
 (Id.,
 
 at p. 133.)
 

 The Supreme Court in
 
 Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d 413, 429, attempted to clarify stating: “In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer’s intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect. [Citation.] A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer’s plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design. Rather than applying any sort of deviation-from-the-norm test in determining whether a product is defective in design for strict liability purposes, our cases have employed two alternative criteria in ascertaining, in Justice Traynor’s words, whether there is something ‘wrong, if not in the manufacturer’s manner of production, at least in his product.’ ”
 

 Cessna, after summarizing the broad field of law respecting manufacturers’ liabilities in “second accidents” involving defective product or design concedes the “modern trend,” the “majority view,” is expressed in
 
 Larsen
 
 v.
 
 General Motors Corporation,
 
 391 F.2d 495.
 
 Larsen
 
 imposed liability for a plaintiff’s injuries resulting from defective product or design in a second collision fact circumstance but “under negligence” rules. The
 
 Larsen
 
 decision was one of the first to involve “crashworthiness
 
 *1016
 
 concepts”; Larsen based his theory of recovery on “negligence” not on strict liability. Therefore the
 
 Larsen
 
 court did not address the question of applicability of the doctrine of strict liability to a crashworthiness case.
 
 Cronin
 
 cites
 
 Larsen
 
 for the proposition “manufacturers must take accidents into consideration as foreseeable occurrences involving their product.”
 
 Larsen
 
 is not relied on by
 
 Cronin
 
 for a negligence rule in determining liability in a secondary accident. Thus
 
 Cronin
 
 follows
 
 Larsen
 
 but not into the thicket Cessna would take us.
 

 Cessna argues
 
 Cronin
 
 is distinguishable from the classic crashworthiness cases involving the design of a motor vehicle where a manufacturer may be held liable if the design of the vehicle does not provide a reasonable degree of safety to its occupants in the event of a foreseeable collision. What distinguished
 
 Cronin
 
 says Cessna, is the fact the defective product was a
 
 safety
 
 hasp which failed to perform the function for which it was designed; it is urged
 
 Cronin
 
 simply involves a failure of a part to do what it was intended to do. Cessna’s premises are patently true but are simply an obtuse restatement of the core requirement for imposing strict liability. In addition, Cessna would attempt to equate the hasp defect with a failure upon the part of some
 
 safety
 
 device such as an air bag or seat belt.
 

 To buttress this argument Cessna cites
 
 May
 
 v.
 
 Portland Jeep, Inc., 265
 
 Ore. 307 [509 P.2d 24], where the Oregon court makes this distinction concerning product liability rules; “. . . they are not applicable to situations where the defect is in equipment, the sole purpose of which is to protect occupants from injury in case of accident.”
 
 (Id,
 
 at p. 27.) The California courts have made no such similar exclusion with respect to products having a safety function.
 

 Cessna cites
 
 Turner
 
 v.
 
 General Motors Corporation
 
 (Tex.Civ.App. 1974) 514 S.W.2d 497, for the rule a manufacturer may be liable for failing to produce a “crashworthy” vehicle and asserts the case measured the manufacturer’s conduct in the light of reasonable care under the circumstances, i.e., a negligence standard.
 
 Turner
 
 involved an action based upon strict liability for personal injuries received when an automobile roof collapsed following the primary accident causing injury. Turner contended his injuries were aggravated by the collapse of the automobile roof. The Texas court adopted the
 
 Larsen
 
 doctrine and concerned itself with the dilemma presented by the language of section 402A of Restatement Second of Torts. The Texas court straddled this question holding the issues were essentially the same “whether suit is
 
 *1017
 
 brought under general negligence or under strict tort liability.” The court stated: “Preliminary to a discussion of the question of crashworthiness, it must be noted that the issues and arguments pertinent to the question are essentially the same whether suit is brought under general negligence or under strict tort liability. Most of the decisions from other jurisdictions involving crashworthiness were brought under negligence, but they are nevertheless applicable here. The issue of a manufacturer’s exercise of due care under negligence becomes the issue of whether he has put an unreasonably dangerous product into the stream of commerce under strict liability, and the issues of foreseeability and intended use under negligence are transformed into the issue of normal use under strict liability.”
 
 (Turner
 
 v.
 
 General Motors Corporation, supra,
 
 514 S.W.2d 497, 502-503.)
 

 Of greater significance is the
 
 Turner
 
 court’s analysis of, and distinguishing of
 
 Cronin:
 
 “The moderate approach of Dreisonstok [requiring
 
 negligent
 
 design] to the issue of crashworthiness should dispel General Motors’ fears of absolute liability. This approach may be contrasted with that of Cronin v. J. B. E. Olson Corporation, 8 Cal.2d 121, . . . There, a clasp holding bread trays on a delivery truck failed to hold the trays in a collision, sending the driver through the windshield. The plaintiff recovered under his allegation of defective design in strict liability. The court adopted Larsen and then stated that it was not necessary for a plaintiff to establish that the product was unreasonably dangerous after he had shown a defect and causation, because such a requirement would place too onerous a burden upon plaintiffs. Such an approach to crashworthiness does indeed make insurers of manufacturers.” (Tur
 
 ner
 
 v.
 
 General Motors Corporation, supra,
 
 at p. 505.) We need not accept the Texas court’s view, in toto, of the holding of
 
 Cronin,
 
 yet the “contrast” is made clear. California does not require a crash-worthiness suit to be brought under “general negligence” doctrines. (See
 
 Daly
 
 v.
 
 General Motors Corp.,
 
 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].)
 

 California has not only imposed responsibility on a manufacturer for a defective or defectively designed part causing the injuiy in a secondary accident matrix but has done so under strict tort liability rules. California does not require proof the defective part or design be “unreasonably dangerous” to the unsuspecting customer. The cases cited by Cessna from other jurisdictions are not controlling. For subsequent California cases involving secondary accident—crashworthiness cases— following
 
 Cronin
 
 premises, see
 
 Daly
 
 v.
 
 General Motors Corp., supra,
 
 20
 
 *1018
 
 Cal.3d 725, 733;
 
 Horn
 
 v.
 
 General Motors Corp., supra,
 
 17 Cal.3d 359, 367;
 
 Self
 
 v.
 
 General Motors Corp., supra,
 
 42 Cal.App.3d 1;
 
 Culpepper
 
 v.
 
 Volkswagen of America, Inc.,
 
 33 Cal.App.3d 510 [109 Cal.Rptr. 110];
 
 Buccery
 
 v.
 
 General Motors Corp., supra,
 
 60 Cal.App.3d 533.
 

 Cessna argues that
 
 Buccery, supra,
 
 approved a balancing test by the trier of fact in determining defective design “consistent with . . .
 
 applying
 
 negligence principles.” (P. 547.) The language used by the
 
 Buccery
 
 court (p. 547) does not pertain to the issue of what standard—negligence or strict liability—should be followed as a basis for imposing liability. Rather the balancing test discussed is the means of evaluation to be used by the trier of fact in determining whether the product is defective in design. This subsidiary procedural issue is clarified by the Supreme Court in
 
 Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d 413, where it was said:
 

 “Numerous California decisions have implicitly recognized this fact and have made clear, through varying linguistic formulations, that a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product’s design embodies ‘excessive preventable danger,’ or, in other words, if the jury finds that
 
 the risk of danger inherent in the challenged design outweighs the benefits of such design.
 
 [Citations.]
 

 “A review of past cases indicates that in evaluating the adequacy of a product’s design pursuant to this latter standard, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.”
 
 (Id.,
 
 at pp. 430-431.)
 

 That the trier of fact is required to engage in a balancing process in evaluating a claimed design defect in no way changes the
 
 Cronin
 
 rule of strict liability in the defective product or defective design case.
 

 Defendant next argues the “problem is one of semantics as well as legal theoiy.” One need only contrast the burden of proof requirements on the plaintiff in the law of negligence and warranty with that imposed where strict liability is the rule to perceive the flaw in Cessna’s argument. McGee’s desire to submit the action to the jury on the premise of strict liability is not based solely on an attempt to free herself from the
 
 *1019
 
 defense of comparative negligence as Cessna argues. While valid at the time of trial here, such legal posture became untenable since
 
 Daly
 
 v.
 
 General Motors Corp., supra,
 
 20 Cal.3d 725. Rather, McGee seeks to establish liability without proof of negligence, without proof of foreseeability, without proof the defendant failed to act reasonably in the design or manufacture of its product. It is a desire to shift the burden to the manufacturer to attempt to show the product is not defective once she makes a prima facie showing her injuries were proximately caused by the product’s design. These significant differences follow from a choice of one or the other avenues to liability. We are not dealing with a semantic problem.
 

 Cessna next contends the crashworthiness concept should not be applied to aviation cases; aircraft safety design requirements are matters to be left to legislative determination. It is argued the strict liability approach to responsibility would be unfair to manufacturers of aircraft. These are not legal arguments. They are best left for the Legislature.
 

 Cessna next contends—upon the assumption the court’s instructions were improper—the evidence introduced at the time of trial was sufficient to uphold the judgment.
 

 It is urged the jury’s verdict may still stand if the record supports a finding the design of the aircraft, whether simply defective or negligently designed, was not a proximate cause of plaintiff’s injuries. In substance, Cessna argues the judgment below should not be reversed if there is substantial evidence to support the verdict even though the case was submitted to the jury on a wrong theory of law. It is true a judgment will not be reversed if there is no other verdict possible as a matter of law. (See
 
 Oettinger
 
 v.
 
 Stewart,
 
 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) However, this rule has no application where the jury has been erroneously instructed. Judgment obtained based upon a wrong application of law cannot stand.
 

 As was stated in
 
 Clement
 
 v.
 
 State Reclamation Board,
 
 35 Cal.2d 628, 643-644 [220 P.2d 897]: “The rule ... is not applicable, however, to a case such as this, in which the jury has been precluded by erroneous instructions from considering a valid theory upon which a result different from that actually reached might have been supported. The error in such a case is not cancelled by the fact that the jury might have found for the prevailing party on some other ground. ‘It is true that in determining whether a verdict is supported by the evidence, we must assume that the
 
 *1020
 
 juiy accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the juiy might have believed the evidence upon which the [cause of action or defense of] the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.’ ”
 
 (Clement, supra,
 
 pp. 643-644.) See
 
 Nunneley
 
 v.
 
 Edgar Hotel,
 
 36 Cal.2d 493, 498 [225 P.2d 497]; see also
 
 Henderson
 
 v.
 
 Harnischfeger Corp.,
 
 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353], which states the applicable rules: “Our problem in the case at bench is one of the latter kind—involving not the sufficiency of the evidence, but rather the effect on the jury of an improper instruction.”
 
 (Ibid.)
 

 [2]
 

 (See also
 
 Buchanan
 
 v.
 
 Los Angeles County Flood Control Dist., 56
 
 Cal.App.3d 757, 766 [128 Cal.Rptr. 770].) We conclude the trial court’s erroneous instructions created reversible error.
 

 McGee contends the trial court’s statement to the jury to the effect the sole issue in the case “was the proximate cause of the accident” constituted prejudicial error. We agree such an observation to the jury was incomplete, incorrect, and possibly misleading. However, we need not determine whether it was reversible error in view of our finding of incorrect instructions to the jury on a vital issue of the case.
 

 Finally, McGee contends trial court error was committed in allowing the juiy to consider the fault of defendant Hedger. Before trial, Cessna brought a motion contending the decision in
 
 Li
 
 v.
 
 Yellow Cab Co.,
 
 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], required the percentage of the fault of an absent and settling tortfeasor, in this case Mr. Hedger, be determined by the jury. After this determination it was argued the remaining defendant, Cessna, would be immune from any liability for the percentage of fault attributed to the absent and settling tortfeasor. The court in response to Cessna’s motion ruled: “I am going to find that apportionment will be allowed the defendant; that the degree of percentage of negligence of all parties and the settling defendant will be
 
 *1021
 
 determined by the jury to be done by special verdicts; that a special verdict will be given the jury to determine the total amount of damages; that the defendant will only be liable for the percentage of his liability for damages after measuring the plaintiff’s liability, settling defendant’s liability and the defendant Cessna.”
 

 At the time of the trial
 
 American Motorcycle Assn.
 
 v.
 
 Superior Court,
 
 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], was undecided, yet under submission to the Supreme Court. In its recently released decision, the Supreme Court held: “In order to attain such a system, in which liability for an indivisible injury caused by concurrent tortfeasors will be borne by each individual tortfeasor ‘in direct proportion to [his] respective fault,’ we conclude that the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis. In reaching this conclusion, we point out that in recent years a great number of courts, particularly in jurisdictions which follow the comparative negligence rule, have for similar reasons adopted, as a matter of common law, comparable rules providing for comparative contribution or comparative indemnity.”
 
 (Id.,
 
 at p. 598.)
 

 More specifically applicable here as to the rule to be applied as to a joint tortfeasor with whom there has been a settlement the Supreme Court said at pages 603-604: “Although section 877 reflects a strong public policy in favor of settlement, this statutory policy does not in any way conflict with the recognition of a common law partial indemnity doctrine but rather can, and should, be preserved as an integral part of the partial indemnity doctrine that we adopt today. Thus, while we recognize that section 877, by its terms, releases a settling tortfeasor only from liability for contribution and not partial indemnity, we conclude that from a realistic perspective the legislative policy underlying the provision dictates that a tortfeasor who has entered into a ‘good faith’ settlement [citation] with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor. As the Court of Appeal noted recently in
 
 Stambaugh
 
 v.
 
 Superior Court
 
 (1976) 62 Cal.App.3d 231, 236 . . . ‘Few things would be better calculated to frustrate [section 877’s] policy, and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one’s joint tortfeasors, and perhaps further liability.’ This observation is as applicable in a partial indemnity framework as in the contribution context. Moreover, to preserve the incentive to settle which section 877 provides to
 
 *1022
 
 injured plaintiffs,
 
 we conclude that a plaintiff’s recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement,
 
 rather than by an amount measured by the settling tortfeasor’s proportionate responsibility for the injury.” (Italics added.)
 

 The Supreme Court in
 
 Safeway Stores, Inc.
 
 v.
 
 Nest-Kart,
 
 21 Cal.3d 322, 327 [146 Cal.Rptr. 550, 579 P.2d 441], declares that comparative fault principles should be applied to apportion responsibility between a strictly liable defendant and a negligent defendant in a product’s liability case.
 

 The rules of
 
 American Motorcycle Assn., supra,
 
 extend to and do authorize deduction of the amount received by McGee in a good faith settlement with Hedger—an allegedly negligent tortfeasor—from her recovery, if any, received upon judgment against a nonsettling manufacturer of a defective product.
 

 We conclude, and for guidance of the trial court upon any retrial of this matter observe: plaintiff’s recovery, if any, from Cessna should be diminished only by the amount plaintiff actually recovered in a good faith settlement rather than by an amount measured by the settling tortfeasor’s proportionate responsibility for the injury.
 

 Judgment reversed.
 

 Brown (Gerald), P. J., and Wiener, J., concurred.
 

 A petition for a rehearing was denied August 4, 1978, and respondent’s petition for a hearing by the Supreme Court was denied September 27, 1978.
 

 [1]
 

 “The Court first gave the general definitions of negligence, to wit: ‘Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.
 

 “ ‘It is the failure to use ordinary or reasonable care.
 

 “ ‘Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.’
 

 “ ‘One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If such a result from certain conduct would be foreseeable by a person of ordinary prudence with like knowledge and like situation, and if the conduct reasonably could be avoided, then not to avoid it would be negligence.’
 

 “The Court also instructed on a manufacturer’s duty as follows: ‘The manufacturer of a product that is reasonably certain to be dangerous if negligently made, has the duty to exercise reasonable care in the design, manufacture, testing and inspection of the product so that the product may be safely used in a manner and for a purpose for which it was made.
 

 “ ‘A Failure to fulfill that duty is negligence.’ ” The court further instructed the jury in accordance with the instruction requested by plaintiff: “ ‘Aircraft manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. The manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practical to avoid crash injuries and to minimize their seriousness.’ ”
 

 The court submitted a special interrogatory to the jury: “Question No. 3: Do you find negligence of the defendant regarding the crashworthiness of the subject aircraft was a proximate cause of the injuries to the plaintiff? Answer ‘yes’ or ‘no.’ ” To this special interrogatory, the jury answered “no.”
 

 [2]
 

 Cessna asserts and McGee agrees the aircraft did have a fuel shutoff valve located on the instrument panel independent of the fuel selector switch. Cessna would rely on this as a factual basis for affirming the judgment irrespective of the improper charging on the law. McGee replies: the location of this fuel shutoff valve was part of the design defect alleged by plaintiff to exist in the fuel system. Specifically, she contends the fuel shutoff valve is so far “down the line” from the source of the fuel (in the wings of the aircraft) any rupture of the fuel line between the fuel cells contained in the wings and this fuel shutoff valve means the fuel will flow into the cockpit occupied by the pilot and the passengers to feed any fire started therein. How the trier of fact will determine this factual question to be submitted on a proper instruction on the law we do not predict.