[No. C017469. Third Dist. Feb. 10, 1995.]

DIANE FERRARI, Plaintiff and Appellant, v.
GRAND CANYON DORIES et al., Defendants and Respondents.

**COUNSEL**

Trezza, Ithurburn, Steidlmayer & Ithurburn and Jeanette L. Ithurburn for Plaintiff and Appellant.

Edson & LaPlante, Domenic D. Spinelli and Lynette T. Morrow for Defendants and Respondents.

**OPINION**

**PUGLIA, P. J.**—Plaintiff appeals from a judgment of dismissal following an order granting defendants' motion for summary judgment. Plaintiff's complaint seeks damages for injuries suffered when her head struck the metal frame of a raft during a commercial rafting trip sponsored and conducted by defendants. The trial court concluded plaintiff's negligence claim is barred by the doctrine of primary assumption of risk and her product liability claim fails because defendants supplied a service, not a product. We shall affirm.

I

Plaintiff participated in a five-day commercial raft trip on the Colorado River sponsored and conducted by defendant Grand Canyon Dories, also known as GCD Raft Trips (hereafter GCD). Rubber rafts used on the trip were equipped with metal frames laid across the top of the gunwales and secured by straps. These frames are constructed of metal tubing joined together in the shape of a rectangle which is covered by fabric to form a flat surface on which supplies and equipment may be secured. The frame is positioned in the center of the raft and extends across its entire width and over approximately half its length, leaving room at the front and rear of the raft for passengers. Oar locks are attached to each side of the frame and in the center is a place for a "guide" to sit and row or steer.

Prior to embarking on the trip, plaintiff signed a "release" absolving GCD of responsibility for injuries she might sustain during the trip. Plaintiff was also given safety instructions. For example, she was told where to sit, that it was necessary to hold onto the raft while navigating rapids and where to hold on, and how to react if thrown out of the raft into the water.

During the trip, as the raft was approaching a rapids, plaintiff was kneeling in the rear taking photographs. She asked the guide if she could remain in that location and continue taking pictures. He advised she could but admonished her to hold on. Plaintiff held onto the raft with one hand and held the camera with the other. While traversing the rapids, the raft made a "violent movement," causing plaintiff to strike her head on the metal frame several times, resulting in the injuries complained of in this action.

Plaintiff initiated this action against GCD and one of its partners, George Wendt. Also named as defendants are Outdoors Unlimited River Trips and Oars, Inc.[1] Professional River Outfitters, the manufacturer of the metal frame, was added as a Doe defendant but entered into a good faith settlement and was dismissed.

The complaint alleges negligence and product liability. Defendants moved for summary judgment relying on express and implied assumption of risk and the fact they provided a service, not a product. The court granted summary adjudication as to the product liability claim only. Defendants renewed their motion on the negligence claim and the court granted the motion on the basis of implied assumption of risk.

## II

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier* v. *Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

In their motion for summary judgment, defendants argued the type of injury suffered by plaintiff is a risk inherent in white water rafting and hence plaintiff's claim is barred by the doctrine of primary assumption of risk.

In *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30,

---

[1]The relationship to this dispute of Outdoors Unlimited River Trips and Oars, Inc., is not explained in the complaint or the summary judgment papers.

834 P.2d 724] (*Ford*), the court explained primary assumption of risk occurs when a party voluntarily participates in a sporting event or activity involving inherent risks. Such risks include, for example, an errantly thrown ball in baseball or a carelessly extended elbow in basketball. (3 Cal.4th at p. 316.) Primary assumption of risk is merely another way of saying no duty of care is owed for risks inherent in a given sport or activity. It is a complete bar to recovery. (3 Cal.4th at pp. 314-315.)

The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature. (*Knight, supra*, 3 Cal.4th at pp. 318-319.) For example, in *Ford,* the court held the driver of a boat owed no duty to a skier who was injured when his head struck a limb extending over the water. In rejecting the plaintiff's argument that primary assumption of risk should not apply to a cooperative activity such as waterskiing, the court explained: "Even when a water-skier is not involved in a 'competitive' event, the skier has undertaken vigorous athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport. Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports." (*Ford, supra,* 3 Cal.4th at p. 345.)

In *Knight* and *Ford*, the court held negligent conduct of a participant in an active sport is an inherent part of the game. Certain sports have inherent risks which do not involve the want of ordinary care by other participants. Skydiving is an obvious example. In snow skiing, the risk of falling on steep slopes or uneven terrain is an inherent part of the sport. " 'Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snowmaking or snow-grooming equipment.' " (*Danieley* v. *Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 123 [266 Cal.Rptr. 749], quoting from Mich. Stat. Ann., § 18.483 (22)(2).)

Plaintiff acknowledges that white water rafting has certain inherent risks. For example, violent movement of the raft while traversing rapids can

cause the raft to overturn or the occupants to be thrown into the water where they risk striking rocks or even drowning. The risk of being thrown involuntarily about inside the raft and colliding with objects or people therein is also an inherent part of the activity.[2] Rafting trips are generally rated according to the difficulty of the rapids encountered in order that those embarking on a trip may know what to expect.

■ "[T]he scope of the legal duty owed by a defendant frequently will depend on the defendant's role in, or relationship to, the sport." (*Knight, supra*, 3 Cal.4th at p. 317.) It is generally recognized commercial operators of recreational activities "have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." (*Knight, supra*, 3 Cal.4th at pp. 315-316.)

In *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270], an experienced rider was injured when she fell from a horse during training. She sued her instructor and the owner of the stables for negligence claiming they caused her to jump over fences which were unreasonably and unnecessarily high and improperly designed, located, and spaced. The Court of Appeal reversed summary judgment for the defendants. While recognizing the risk of injury from a fall cannot be eliminated "and in fact creates the challenge which defines the sport," i.e., is an inherent part of the sport, the court concluded these defendants owed a duty "to avoid an unreasonable risk of injury to plaintiff and to take care that the jumping array was not beyond the capability of horse and rider." (*Id.* at p. 823.)

■ As the commercial sponsors and operators of the rafting trip, defendants owed plaintiff a duty not to increase the risks inherent in the activity. Plaintiff contends defendants breached this duty in two ways: (1) by permitting her to sit in the back of the raft and take pictures while traversing the rapids; and (2) by using a raft configured with a metal frame superstructure.

Permitting plaintiff to sit in the back of the raft did not increase the risk inherent in the activity. According to the undisputed testimony, passengers

---

[2]In her deposition, plaintiff acknowledged she appreciated the possibility of being thrown out of the raft but professed not to have considered the possibility of being thrown about within the raft. This testimony strikes us as naive if not disingenuous.

normally sit in either the front or rear of the raft. Plaintiff was instructed before the trip to hold onto the raft while in rapids and was reminded again to hold on when she was given permission to remain in the back of the raft just before the injury occurred. To quarrel with the fact plaintiff was not then reminded to hold on with both hands is mere hairsplitting, as plaintiff was already aware holding on with two hands rather than one reduced the risk of injury.

The installation by defendants of the metal frame presents a different question. Defendants' obligation not to increase the risks inherent in the activity included a duty to provide safe equipment for the trip, such as a safe and sound craft. In *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89], the plaintiff, a student at a jockey riding school, was injured when the horse he was riding fell down. Evidence was presented suggesting the horse was injured and the plaintiff was instructed to ride it on the outside portion of a track which was rockier than elsewhere. The horse stepped on an object and fell, causing the plaintiff to be injured. The Court of Appeal concluded the school owed the plaintiff "a duty of ordinary care to see to it that the horse [it] assigned [the plaintiff] to ride was safe to ride under the conditions [it] prescribed for that activity." (13 Cal.App.4th at p. 1535; and see *Bush* v. *Parents Without Partners* (1993) 17 Cal.App.4th 322, 329 [21 Cal.Rptr.2d 178].)

Given the nature of the risks inherent in white water rafting, it is readily apparent that providing a raft not equipped with grips or other mechanisms to help the passengers avoid ejection or being thrown about inside would unreasonably increase the risk of injury.[3] Similarly, use of a raft constructed with materials incapable of withstanding the impacts expected from ordinary use would also increase the risk. Defendants owed a duty to their customers to provide a properly equipped raft made of materials adequate for the intended purpose.

The question presented here is whether defendants also owed plaintiff a duty to provide rafts not configured with exposed metal frames. ██ In a given case, the question of whether a duty is owed, and the extent of that duty, depends on a number of factors, chief among which is the foreseeability of harm or, as in this context, the foreseeability of an increase in the risk over that which is inherent. Other factors to be considered are the degree of certainty the plaintiff was injured, the connection between the defendant's

[3]We acknowledge that persons engaged in paddling a boat cannot wield a paddle and grasp a hand grip at the same time. There are doubtless other ways to secure the occupants of a boat who are engaged in paddling it, but since no such boat was involved here the matter need not further vex us.

conduct and the injury, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the burden on the defendant and the community in imposing a duty, and the availability of insurance. (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 124 [211 Cal.Rptr. 356, 695 P.2d 653]; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

The trial court found, as a matter of law, that plaintiff assumed the risk of her injury, i.e., with respect to her injury, defendants owed plaintiff no duty of care. The record supports that finding. John Vail, the co-owner of GCD, submitted a declaration stating the rubber rafts and aluminum frames used by his company "are the standard in the industry" and were used "without any modification whatsoever." According to Vail, the aluminum frames "are manufactured generally to fit rubber boats manufactured for whitewater rafting."

Defendants also submitted the declaration of James Segerstrom, an expert in white water rafting risks and equipment. Segerstrom confirmed that the equipment used, specifically an "oar boat . . . with a fixed frame in the middle to help the guide row and maneuver," "is the standard, customary, and common equipment" for white water rafting on the Colorado River. According to Segerstrom, "[t]here was nothing unusual or out of the ordinary concerning the raft in which plaintiff Ferrari was situated prior to her accident." Finally, Segerstrom opined plaintiff "was situated in a normal and customary location within the oar boat as seating is standard in both the front and rear areas of the boat." Plaintiff presented no evidence to refute Segerstrom's declaration.

While it is reasonably foreseeable a passenger being tossed around inside a raft configured with a metal frame might strike the frame and sustain injury, there is no evidence to suggest this is a risk out of the ordinary for white water rafting. Such sport, by its very nature, involves the risk of striking objects both inside and outside the raft. It is the thrill of challenging nature and running the rapids without mishap which gives the sport its distinct allure and sets it apart from, for example, a trip down the giant slide at Waterworld.

Plaintiff suggests defendants could have utilized safer alternatives to the metal frame. However, there is no evidence of the availability or feasibility of safer alternatives to the industry standard, or of safety features such as padding or helmets. Perhaps the metal frame could have been padded, but so too could all the other hard objects in or on the raft. If such objects could be padded, so too could the passengers themselves in order to avoid injury from bumping into one another.

Uncontroverted evidence established rafts with metal frames, as used by defendants, were the standard in the industry. These rafts define the nature of the sport. A significant change in the type of watercraft to enhance safety would necessarily reduce the challenge of the sport. Defendants' evidence establishes without contradiction that in respect to the injury plaintiff sustained, defendants owed plaintiff no duty of care. Primary assumption of risk bars recovery.[4]

## III

■ Plaintiff contends the trial court erred in granting summary judgment on her product liability claim.[5] The complaint alleges four theories of product liability: breach of express warranty, breach of implied warranty, negligence, and strict liability. On appeal, plaintiff has abandoned the warranty theories. The product liability negligence theory is encompassed in plaintiff's separate count for negligence. As to strict liability, plaintiff contends the rafts were defective in that the metal frames were not padded and the rafts were not equipped with helmets.

■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury . . . ." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

Strict liability applies to both design and manufacturing defects. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 426 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) A product is considered defectively designed for strict liability purposes "(1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove . . . that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (20 Cal.3d at p. 435.)

Strict liability has been imposed against manufacturers and retailers (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391

---

[4]Having so concluded, we need not consider defendants' contention express assumption of risk bars recovery as well.

[5]Plaintiff's discussion of product liability in her brief appears at the end of the argument on assumption of risk. It is not set off by a separate heading. California Rules of Court, rule 15(a), requires each point in a brief on appeal to appear separately under an appropriate heading. Although plaintiff has not complied with this rule, defendants have briefed the issue and we shall therefore overlook plaintiff's default and address it.

P.2d 168]) as well as lessors who are in the business of leasing to the general public (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 253-254 [85 Cal.Rptr. 178, 466 P.2d 722]). In addition to purchasers and lessees, strict liability has been applied in favor of injured third parties who have no proprietary interest in the product. (See, e.g., *McGee* v. *Cessna Aircraft Co.* (1978) 82 Cal.App.3d 1005 [147 Cal.Rptr. 694] [airplane passenger]; *Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81 [91 Cal.Rptr. 301] [commercial laundry customer].) However, "[c]ourts have not extended the doctrine of strict liability to transactions whose primary objective is obtaining services. . . ." (*Pierson* v. *Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 344 [264 Cal.Rptr. 673], citations omitted.) For example, in *Pena* v. *Sita World Travel, Inc.* (1978) 88 Cal.App.3d 642, 644-645 [152 Cal.Rptr. 17], the court refused to apply strict liability to a travel agency which arranged a tour on which the plaintiff was injured.

■ Plaintiff contends the raft is a product as contemplated by the doctrine of strict product liability, and defendants are therefore subject to strict liability as licensors of the raft. In a given transaction involving both products and services, liability will often depend upon the defendant's role. For example, an airline passenger injured because of a defect in the craft would have a strict liability claim against the manufacturer. (*McGee* v. *Cessna Aircraft Co., supra,* 82 Cal.App.3d 1005.) The manufacturer's role is that of a provider of a product, the airplane. On the other hand, the airline operating the plane would be primarily involved in providing a service, i.e., transportation. The airline is itself the end user of the product and imposition of strict liability would be inappropriate.

In *Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68 [212 Cal.Rptr. 283, 60 A.L.R.4th 709], the plaintiff was injured by an electric shock delivered to her home due to a defective transformer. Although we held the defendant could be liable as the provider of a product, i.e., the electricity delivered to the plaintiff's home (*id.* at pp. 83-84), we also concluded the defendant could not "be held strictly liable in tort for the transformer's defects per se. [Citation.]" (*Id.* at p. 76.) As to the transformer, the defendant was the ultimate user.

In *Pierson* v. *Sharp Memorial Hospital, Inc., supra,* 216 Cal.App.3d 340, the plaintiff was injured during a visit to her husband's hospital room when she fell because of allegedly defective carpet. The court held strict liability inapplicable because the hospital was primarily involved in providing a service. "A hospital 'is engaged in the process of providing everything necessary to furnish the patient with a course of treatment.' . . . A patient's room is part of the specialized facilities enabling the patient to receive

24-hour nursing care and immediate access to other vital medical services. . . . The room is an integral component of the professional medical services hospitals provide." (216 Cal.App.3d at pp. 346-347, citations omitted; accord, *Wagner* v. *Coronet Hotel* (1969) 10 Ariz.App. 296 [458 P.2d 390, 394-395] [hotel not strictly liable for injury to guest caused by allegedly defective bath mat]; *Livingston* v. *Begay* (1982) 98 N.M. 712 [652 P.2d 734, 738-739] [hotel not strictly liable for death allegedly caused by defective room heater]; *Siciliano* v. *Capitol City Shows, Inc.* (1984) 124 N.H. 719 [475 A.2d 19, 25] [amusement park operator not strictly liable for injury caused by allegedly defective ride]; *Bolduc* v. *Herbert Schneider Corp.* (1977) 117 N.H. 566 [374 A.2d 1187, 95 A.L.R.3d 197] [ski tramway operator not strictly liable for injuries caused by defects in the conveyance].)

In *Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420], a child was injured when his hand was caught in an allegedly defective washing machine at a commercial laundry. In that case the court held the operator strictly liable, explaining: "Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer, or lessor, he does provide the product to the public for use by the public, and consequently does play more than a random and accidental role in the overall marketing enterprise of the product in question." (*Id.* at p. 326.)

The facts here are distinguishable from those in *Garcia* v. *Halsett, supra*, and more analogous to those in *Pierson* v. *Sharp Memorial Hospital, Inc.*, *supra*, and similar cases. Defendants did not provide plaintiff with a raft for her to use. They provided a service, i.e., recreational raft transportation on the Colorado River. Defendants provided all the materials for the trip, instructions on rafting safety, and guides to perform the labor and conduct the activities. Use of the raft, like the carpet in *Pierson* v. *Sharp Memorial Hospital, Inc.*, *supra*, was merely an incident to this service. The law of strict product liability does not apply to defendants on these facts.

The judgment is affirmed.

Sims, J., and Davis, J., concurred.

A petition for a rehearing was denied March 7, 1995, and appellant's petition for review by the Supreme Court was denied April 27, 1995.