[Civ. No. 50954. First Dist., Div. Three. Jan. 18, 1983.]

TONI ANN DIAZ, Plaintiff and Respondent, v.
OAKLAND TRIBUNE, INC., et al., Defendants and Appellants.

120

COUNSEL

Cooper, White & Cooper, R. Barry Churton, Neil L. Shapiro, John Mahoney and Carey F. Corbaley for Defendants and Appellants.

O'Neill & Bridgman, Richard D. Bridgman, De Goff & Sherman and Victoria J. De Goff for Plaintiff and Respondent.

OPINION

BARRY-DEAL, J.—Plaintiff Toni Ann Diaz (Diaz) sued the Oakland Tribune, Inc., owners and publishers of the Oakland Tribune (the Tribune), and Sidney Jones (Jones), one of its columnists, for invasion of privacy. Diaz claimed that the publication of highly embarrassing private facts in Jones' March 26, 1978, newspaper column was unwarranted and malicious and caused her to suffer severe emotional distress. The jury awarded Diaz $250,000 in compensatory damages and $525,000 in punitive damages ($25,000 against Jones and $500,000 against the Tribune). Judgment was entered on February 14, 1980. Defendants' motion for a new trial based on insufficiency of the evidence, errors of law, and excessive damages was denied. This timely appeal followed. As discussed below, we reverse the judgement because of instructional errors.

The facts are for the most part undisputed. Diaz is a transsexual. She was born in Puerto Rico in 1942 as Antonio Diaz, a male. She moved to California from New York in 1964. Suffice it to say that for most of her life Diaz suffered from a gender identification problem and the anxiety and depression that accompanied it. She testified that since she was young she had had the feeling of being a woman.[1] In 1968 Diaz began receiving psychological counseling and hormone therapy. In 1970 or 1971 Diaz embarked on the lengthy process of evaluation as a candidate for gender corrective surgery at the Stanford University Gender Dysphoria Clinic. She was ultimately considered to be a good candidate for surgery. In 1975 gender corrective surgery was performed by the Stanford staff.[2]

According to Diaz the surgery was a success. By all outward appearances she looked and behaved as a woman and was accepted by the public as a woman. According to her therapist, Dr. Sable, her physical and psychological identities were now in harmony.

Diaz scrupulously kept the surgery a secret from all but her immediate family and closest friends. She never sought to publicize the surgery. She changed her name to Toni Ann Diaz and made the necessary changes in her high school records, her social security records, and on her driver's license. She tried unsuccessfully to change her Puerto Rican birth certificate. She did not change the gender designation on her draft card, however, asserting that it would be a useless gesture, since she had previously been turned down for induction.

Following the surgery she no longer suffered from the psychological difficulties that had plagued her previously. In 1975 she enrolled in the College of Alameda (the College), a two-year college. The College was one of five colleges of the Peralta Community College District.

In spring 1977, she was elected student body president for the 1977-1978 academic year, the first woman to hold that office. Her election and an unsuccessful attempt to unseat her were reported in the College newspaper, the Reporter, in the May 17, June 1, and June 14, 1977, editions. At no time during the election did Diaz reveal any information about her sex-change operation.

In 1977 Diaz was also selected to be the student body representative to the Peralta Community College Board of Trustees (the Board).[3] Diaz's selection as

---

[1] Diaz's therapist, Allen Sable, Ph.D., described a transsexual as "a person whose identity is to being a woman with a man's body, . . ."

[2] The surgery consists of removal of the external male sexual organs and surgical production of external female genitalia.

[3] The Board governs the affairs of the community college district and oversees an annual budget of $40 million and a student population of almost 34,000.

student body representative, together with her photograph, appeared in the June 1977 issue of the Peralta Colleges Bulletin.

Near the middle of her term as student body president, Diaz became embroiled in a controversy in which she charged the College administrators with misuse of student funds. The March 15, 1978, issue of the Tribune quoted Diaz's charge that her signature had improperly been "rubber stamped" on checks drawn from the associated students' account.

On March 24, 1978, an article in the Alameda Times-Star, a daily newspaper, mentioned Diaz in connection with the charge of misuse of student body funds.[4]

Shortly after the controversy arose, Jones was informed by several confidential sources that Diaz was a man. Jones considered the matter newsworthy if he could verify the information. Jones testified that he inspected the Tribune's own files and spoke with an unidentified number of persons at the College to confirm this information. It was not until Richard Paoli, the city editor of the Tribune, checked Oakland city police records that the information that Diaz was born a man was verified. The evidence reveals that in 1970 or 1971, prior to the surgery, Diaz was arrested in Oakland for soliciting an undercover police officer, a misdemeanor.[5]

On March 26, 1978, the following item appeared in Jones' newspaper column: "More Education Stuff: The students at the College of Alameda will be surprised to learn that their student body president, Toni Diaz, is no lady, but is in fact a man whose real name is Antonio.

"Now I realize, that in these times, such a matter is no big deal, but I suspect his female classmates in P.E. 97 may wish to make other showering arrangements."[6]

Upon reading the article, Diaz became very depressed and was forced to reveal her status, which she had worked hard to conceal. Diaz testified that as a result of the article she suffered from insomnia, nightmares, and memory lapses. She also delayed her enrollment in Mills College, scheduled for that fall.[7]

---

[4]The College of Alameda Reporter for March 14, 1978, also reported on the controversy.

[5]The record reveals that pursuant to a plea bargain, Diaz entered a guilty plea to the charge. However, Diaz was later allowed to withdraw her guilty plea. Following a trial she was acquitted of the charge.

[6]The complete text of the article appears in the appendix to this opinion.

[7]At the time of trial, January 23, 1980, she still had not enrolled.

In her complaint Diaz did not charge that any of the information was untrue, only that defendants invaded her privacy by the unwarranted publicity of intimate facts. Defendants defended on the ground that the matter was newsworthy and hence was constitutionally protected.

At trial the jury returned a special verdict and found that (1) defendants did publicly disclose a fact concerning Diaz; (2) the fact was private and not public; (3) the fact was *not* newsworthy; (4) the fact was highly offensive to a reasonable person of ordinary sensibilities; (5) defendants disclosed the fact with knowledge that it was highly offensive or with reckless disregard of whether it was highly offensive; and (6) the disclosure proximately caused injury or damage to Diaz.

In this appeal defendants challenge the jury's finding on issues Nos. (2) and (3) above. Defendants also urge instructional error and attack the awards of compensatory and punitive damages. Before we address these issues, it is useful briefly to discuss the competing rights involved herein: the right to privacy and the right to free speech and press.

### BACKGROUND

The concept of a common law right to privacy was first developed in a landmark article by Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193, and has been adopted in virtually every state.[8] The specific privacy right with which we are concerned is the right to be free from public disclosure of private embarrassing facts, in short, "the right to be let alone." (*Melvin* v. *Reid* (1931) 112 Cal.App. 285, 289 [297 P. 91].)[9]

The development of the public disclosure tort in California is well documented. (See *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792 [163 Cal.Rptr. 628, 608 P.2d 716]; *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912].) In fact, California has recognized this right for over 50 years. (See *Melvin* v. *Reid, supra,* 112 Cal.App. 285.)[10]

---

[8]See Woito and McNulty, *The Privacy Disclosure Tort and the First Amendment: Should the Community Decide Newsworthiness?* (1979) 64 Iowa L.Rev. 185 (hereafter cited as *The Privacy Disclosure Tort*).

[9]See Nimmer, *The Right to Speak from* Times *to* Time: *First Amendment Theory Applied to Libel and Misapplied to Privacy* (1968) 56 Cal.L.Rev. 935, 958-959, fn. 80 (hereafter cited as *The Right to Speak*.)

[10]It may be reasonably argued that this right is also recognized under the broad right to privacy granted under article I, section 1, of the California Constitution (adopted Nov. 5, 1974). For a more complete discussion, see Gerstein, *California's Constitutional Right to Privacy: The Development of the Protection of Private Life* (1982) 9 Hastings Const.L.Q. 385, 402-411.

■ The public disclosure tort is one of four distinct torts which are actionable under the general rubric of invasion of privacy. The other three are: (1) intrusion upon plaintiff's solitude or into his or her private affairs; (2) "false light" publicity; and (3) appropriation of plaintiff's name or likeness to the defendant's advantage. (*Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 35, fn. 16; *Virgil* v. *Time, Inc.* (9th Cir. 1975) 527 F.2d 1122, 1125.)

The public disclosure cause of action is distinct from a suit for libel or "false light," since the plaintiff herein does not challenge the accuracy of the information published, but asserts that the publicity is so intimate and unwarranted as to outrage the community's notion of decency. (*Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 542; *Sidis* v. *F-R Pub. Corporation* (2d Cir. 1940) 113 F.2d 806, 809 [138 A.L.R. 15].) " 'The gravamen of a defamation action is engendering a false opinion about a person, whether in the mind of one other person or many people. *The gravamen in the public disclosure [privacy] cases is degrading a person by laying his life open to public view.*' " (*The Right to Speak, supra,* at pp. 958-959, italics added.)

Of course, the right to privacy is not absolute and must be balanced against the often competing constitutional right of the press to publish newsworthy matters. (See *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469, 489 [43 L.Ed.2d 328, 345-346, 95 S.Ct. 1029]; *Virgil* v. *Time, Inc., supra,* 527 F.2d 1122, 1127; *Forsher* v. *Bugliosi, supra,* 26 Cal.3d at p. 809; *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 534; *Kapellas* v. *Kofman, supra,* 1 Cal.3d at pp. 35-36.)[11] The First Amendment protection from tort liability is necessary if the press is to carry out its constitutional obligation to keep the public informed so that they may make intelligent decisions on matters important to a self-governing people. (See *Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. at pp. 491-493 [43 L.Ed.2d at pp. 347-348].)

However, the newsworthy privilege is not without limitation. Where the publicity is so offensive as to constitute a " 'morbid and sensational prying into private lives for its own sake, . . . ' " it serves no legitimate public interest and is not deserving of protection. (See *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129; Rest.2d Torts, § 652D, com. h.)

■ As discerned from the decisions of our courts, the public disclosure tort contains the following elements: (1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern. (See *Forsher* v. *Bugliosi, supra,* 26 Cal.3d at pp. 808-809; *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 541-544; *Kapellas* v. *Kofman, supra,* 1 Cal.3d at pp. 34-39.)

---

[11]See *The Privacy Disclosure Tort, supra,* at pages 194-197.

## INSTRUCTIONAL ERROR

At the outset defendants urge that the trial court misinstructed the jury (1) on the right to privacy and (2) that defendants had the burden of proving newsworthiness. We agree and find that either of these errors was prejudicial and requires reversal.

### 1. *The Right to Privacy*

█ Plaintiff Diaz proffered a jury instruction properly defining the right to privacy.[12] However, the trial court, *sua sponte*, added the following language: "It prevents business or government interests from misusing information gathered for one purpose in order to serve other purposes, or to embarrass us. *This right should be abridged only when there is a compelling public need.*" (Italics added.)

The language contained in the last sentence was taken from *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]. The trial court misplaced its reliance on that case. In *White, supra,* plaintiff challenged covert police surveillance of University of California at Los Angeles students in their classrooms. There, the court required the *government* to demonstrate a " 'compelling public need' " for the intrusion. (*Id.,* at p. 775.) That case did not attempt to balance the competing rights of free speech and press against the right to privacy. Rather, it recognized the heavy burden on the government to justify interference with First Amendment freedoms. (*Id.,* at pp. 767-773.)

Unlike the government's activity in *White,* defendants' publication of the article is a preferred right which is not encumbered by the presumption of illegality. Defendants enjoy the right to publish information in which the public has a *legitimate interest.* (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 541; *Virgil* v. *Time, Inc., supra,* 527 F.2d at pp. 1128-1129; Rest.2d Torts, *supra,* § 652D, com. d.) To require that the article meet the higher " 'compelling public need' " standard would severely abridge this constitutionally recognized right of free speech and press.

After examining the entire record, we cannot say that this error was harmless. The instruction misstated the law concerning defendants' right to publish newsworthy matters and necessarily lessened plaintiff's burden of proof. Since plaintiff's verdict may have rested on this erroneous theory, the judgment must be reversed. (See *Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 589-591 [156 Cal.Rptr. 198, 595 P.2d 975]; *McGee* v. *Cessna Air-*

---

[12]The complete instruction reads as follows: "The California Constitution provides that all persons have an inalienable right of privacy. It is the right to live one's life in seclusion, without being subjected to unwarranted or undesirable publicity. In short, it's the right to be left alone."

*craft Co.* (1978) 82 Cal.App.3d 1005, 1019-1020 [147 Cal.Rptr. 694]; *Campbell* v. *Harris-Seybold Press Co.* (1977) 73 Cal.App.3d 786, 791-792 [141 Cal.Rptr. 55].)

### 2. *The Burden of Proving Newsworthiness*

▇ Next, defendants argue that the trial court improperly instructed the jury that the burden of proving newsworthiness was for the defendants. We agree.

The trial court instructed the jury on plaintiff's burden of proof as follows: "In this action, the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"One, that the defendants publicly disclosed a fact concerning plaintiff;

"Two, that before defendants' publication appeared, the fact was private and not public;

"Three, that the fact was one which would be highly offensive to a reasonable person of ordinary sensibilities;

"Four, that the defendants disclosed the fact with knowledge that it was highly offensive or with reckless disregard of whether it was highly offensive or not;

"Five, that the disclosure was a proximate cause of injury or damage to her; and

"Six, the nature and extent of the injuries claimed to have been so suffered, the elements of her damage, and the amounts thereof."

As originally proffered by defendants, this instruction also required plaintiff to prove that the article was not newsworthy. The trial court struck this element from the instruction and, instead, directed the jury that *defendants* had the burden of proving newsworthiness in order to prevail in this action.

Our research has discovered no published decision expressly allocating to one of the parties the burden of proving newsworthiness. While a publisher may *defend* itself against a public disclosure cause of action by proving that the matter was newsworthy, it is misleading to assert that said defendant has the burden of proving newsworthiness to be free from tort liability. As discussed below, the plaintiff has the burden of proving that the publication was not

privileged, i.e., that it was *not* newsworthy. Of course, defendants may rebut plaintiff's showing with evidence that the matter was newsworthy. However, to assert, as plaintiff does, that defendants have the burden of proving newsworthiness is error.

Recognizing the critical position the right to freedom of speech and press occupies in our society, courts are understandably sensitive to any infringement of these rights. (See *Miller* v. *California* (1973) 413 U.S. 15, 22-23 [37 L.Ed.2d 419, 429-430, 93 S.Ct. 2607]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269-270 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 534-535.) Given this awareness, our courts uphold an abridgement of the freedom of expression only in narrowly drawn instances where the benefit of expression is clearly outweighed by the injury to personal or societal interests. (See *Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. at p. 495 [43 L.Ed.2d at p. 349].)[13]

Mindful of the important role performed by the press, it is therefore proper for the plaintiff, in order to state a cause of action, to prove that the publication is not constitutionally protected. This is the rule in the related area of obscenity law.

In *Blount* v. *Rizzi* (1971) 400 U.S. 410 [27 L.Ed.2d 498, 91 S.Ct. 423], the Supreme Court ruled unconstitutional a federal statute which permitted the Postmaster General to refuse delivery of all letters deemed to be obscene and to refuse payment of postal money orders used to purchase obscene matter. The court prescribed certain standards for ensuring the constitutionality of administrative censorship. Among these standards was the requirement that the government bear the burden of initiating judicial review and "of proving that the material is unprotected expression. . . ." (*Id.,* at p. 417 [27 L.Ed.2d at p. 503]; see also *McKinney* v. *Alabama* (1976) 424 U.S. 669, 683-685 [47 L.Ed.2d 387, 398-399, 96 S.Ct. 1189] (conc. opn. of Brennan, J.).)

A similar result was reached in the field of defamation law. In *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, the Supreme Court held that in order for a public official to recover damages against a newspaper in a defamation action, that official must prove that the defamatory statement was made with actual malice, i.e., knowledge of its falsity or a reckless disregard for its truth. (*Id.,* at pp. 279-280 [11 L.Ed.2d at p. 706].) The effect of this rule was to remove from the defendant newspaper the *burden of proving* that the article was true in order to defend against the action. Thus, in order to establish a cause of action, the tort plaintiff had to show that the article was not constitutionally pro-

---

[13]See *The Right to Speak, supra,* at pages 938-948.

tected, i.e., that it was false or made with reckless disregard for the truth. This allowed the press the " 'breathing space' " it needs to pursue its First Amendment obligations. (*Id.*, at pp. 271-272 [11 L.Ed.2d at p. 701].)

A contrary rule would lead to self-censorship. Even though the matter is believed to be true and is in fact true, the defendant newspaper may be deterred from criticizing official conduct because of doubt whether the truthfulness can be proved at trial or out of fear at the expense of having to do so. (*Id.*, at p. 279 [11 L.Ed.2d at p. 706].)

These same concerns are present here. The proof that defendants have published an article containing highly offensive private matters does not itself establish a claim for relief. It certainly must be recognized that an otherwise embarrassing article may be newsworthy, depending on the circumstances. Only when the embarrassing publicity is *not* newsworthy can plaintiff recover damages, consistent with defendants' rights of free speech and press. To hold otherwise would permit a plaintiff to obtain a default judgment against a media defendant without any showing that the defendant had exceeded its constitutional prerogative. The effect would be to read the rights of free speech and press out of the Constitution.

Of course, once plaintiff has established a prima facie case that the publicity is not constitutionally protected, i.e., not newsworthy, defendants can meet it with a showing that the information was newsworthy. However, to place the burden of proving newsworthiness on the defendants in order to defend against the action would have a chilling effect on their freedom of expression.

That the correct approach is to place the burden of proving nonnewsworthiness on the plaintiff is confirmed by the Restatement Second of Torts, *supra,* section 652D, which limits the cause of action to matters which are not of "legitimate concern to the public." (See *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129, fn. 10.)

By parity of reasoning, defendants' constitutional rights of free speech and press should be afforded the same procedural safeguards whether the tort alleged is for defamation or for invasion of privacy. We therefore hold that Diaz had the additional burden of proving that the article was not newsworthy. (See also *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 543.)

The failure to so instruct was reversible error. (See *McGee* v. *Cessna Aircraft Co., supra,* 82 Cal.App.3d at pp. 1019-1020.)

■ As a subsidiary contention defendants also argue that the jury was improperly instructed to perform an "ad hoc balancing" of the competing

rights.[14] We disagree. The challenged instruction, when viewed in the context of other instructions,[15] conforms to the standards set forth in the cases. (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal. 3d at p. 540, fn. 15; *Virgil* v. *Time, Inc., supra,* 527 F.2d at pp. 1129-1130.)

Although the judgment is reversed, it is in the interests of judicial administration to address the merits of defendants' remaining contentions.

## THE PUBLIC DISCLOSURE TORT

### 1. *Private Facts*

■ Defendants next argue that the evidence establishes as a matter of law that the fact of Diaz's original gender was a matter of public record, and therefore its publicity was not actionable.[16] In support of their contention defendants rely on *Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. 469. That reliance is misplaced.

Generally speaking, matter which is already in the public domain is not private, and its publication is protected. (See *Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 38; but see *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 538-539; *Melvin* v. *Reid, supra,* 112 Cal.App. at pp. 290-291.)

In *Cox Broadcasting Corp.,* the Supreme Court ruled that Cohn, the father of a deceased rape victim, could not maintain a disclosure action against media defendants who identified Cohn's daughter as the victim during the television coverage of the murder trial. (*Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. at pp. 496-497 [43 L.Ed.2d at p. 350].) Central to the court's conclusion was the fact that the reporter obtained the victim's name from the indictment, which had been shown to him in open court. (*Id.,* at p. 496 [43 L.Ed.2d at p. 350].)

In a very narrow holding, the court ruled that a state may not impose sanctions on the accurate publication of the name of a rape victim obtained from judicial records which are maintained in connection with a public prosecution

---

[14]The jury was instructed as follows: "In general, determining whether plaintiff, Toni Ann Diaz's, right of privacy is subject to the so-called public interest, must be based upon a balancing of the public interest in obtaining such information against her desire for privacy."

[15]The jury was instructed as follows: "In determining whether the subject article is newsworthy you may consider social value of the fact published, the depth of the article, intrusion into ostensibly private affairs, and the extent to which the plaintiff voluntarily acceded to a position of public notoriety."

[16]Defendants do not challenge the jury's findings that (1) the matter was publicized and (2) the fact was highly offensive to a reasonable person. There is ample evidence in the record to support these findings.

and which themselves are open to public inspection. (*Id.,* at p. 491 [43 L.Ed.2d at p. 347].) Importantly, the court expressly refused to address the broader question of whether the truthful publication of facts obtained from public records can ever be subjected to civil or criminal liability. (*Ibid.*)

Because of its narrow holding, *Cox Broadcasting Corp.* gives us little guidance.[17]

Here there is no evidence to suggest that the fact of Diaz's gender-corrective surgery was part of the public record. To the contrary, the evidence reveals that Diaz took affirmative steps to conceal this fact by changing her driver's license, social security, and high school records, and by lawfully changing her name. The police records, upon which Jones relied, contained information concerning one Antonio Diaz. No mention was made of Diaz's new name or gender. In order to draw the connnection, Jones relied upon unidentified confidential sources. Under these circumstances, we conclude that Diaz's sexual identity was a private matter.

We also do not consider Diaz's *Puerto Rican* birth certificate to be a public record in this instance. In any event, defendants did not rely on that document and cannot be heard to argue that the information contained therein is public.

Moreover, matter which was once of public record may be protected as private facts where disclosure of that information would not be newsworthy. (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 537-538 [publication of identity of ex-offender for past crime was held to be improper]; *Melvin* v. *Reid, supra,* 112 Cal.App. at pp. 290-291 [disclosure of plaintiff's past life as a prostitute, seven years after she reformed, was actionable].)

## 2. *Newsworthiness*

■ As discussed above, whether the fact of Diaz's sexual identity was newsworthy is measured along a sliding scale of competing interests: the individual's right to keep private facts from the public's gaze versus the public's right to know. (See *Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 36.) In an effort to reconcile these competing interests, our courts have settled on a three-part test for determining whether matter published is newsworthy: " '[1] the social value of the facts published, [2] the depth of the article's intrusion into ostensibly private affairs, and [3] the extent to which the party voluntarily acceded to a position of public notoriety. [Citations.]' [Citation.]" (*Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 541.)

---

[17]See *The Privacy Disclosure Tort, supra,* at page 201.

Defendants argue that in light of Diaz's position as the first female student body president of the College, her "questionable gender" was a newsworthy item. As a subsidiary contention, they assert that the issue of newsworthiness should not have been submitted to the jury. We address the latter contention first.

a. *Newsworthiness as a Jury Question*

■ Whether a publication is or is not newsworthy depends upon contemporary community mores and standards of decency. (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* at p. 541; *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129; Rest.2d Torts, *supra,* § 652D, com. h.) This is largely a question of fact, which a jury is uniquely well-suited to decide.[18] (*Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129, fn. 12.)

Defendants argue that the right to publish would suffer at the hands of a jury which, unlike the trial judge, would be more likely to use a general verdict in order to punish unpopular speech and persons. In *Virgil* v. *Time, Inc., supra,* 527 F.2d 1122, the Court of Appeals for the Ninth Circuit in a California case recognized this danger. However, that court concluded that any risk of prejudice may be checked by close judicial scrutiny at the stages of litigation such as summary judgment, directed verdict, and judgment notwithstanding the verdict. (*Id.,* at p. 1130.)[19] Our trial court judges are entirely capable of correcting such jury overreaching.

These same concerns are present in the related field of obscenity law, where community standards define what speech is constitutionally protected. (See *Miller* v. *California, supra,* 413 U.S. 15, 24 [37 L.Ed.2d 419, 430-431].) In an obscenity prosecution the jury is required to make an equally important constitutional decision and has been found to be up to the task. (See *id.,* at p. 25 [37 L.Ed.2d at p. 431].) Accordingly, where reasonable minds could differ, we see no constitutional infirmity in allowing the jury to decide the issue of newsworthiness. (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 543.)

---

[18]See *The Privacy Disclosure Tort, supra,* at pages 223-229.

"It is the shared understandings of the community that establish the conventions by which it is understood just when others are invited into our lives and when they are not." (Gerstein, *California's Constitutional Right to Privacy: The Development of the Protection of Private Life, supra,* 9 Hastings Const.L.Q. at p. 397, fn. omitted.)

[19]See footnote 18, *ante.*

### b. *Newsworthiness as a Matter of Law*

 Next, defendants urge that, as the first female student body president of the College, Diaz was a public figure, and the fact of her sexual identity was a newsworthy item as a matter of law. We disagree.

 It is well settled that persons who voluntarily seek public office or willingly become involved in public affairs waive their right to privacy of matters connected with their public conduct. (*Kapellas* v. *Kofman, supra,* 1 Cal.3d at pp. 36-38.) The reason behind this rule is that the public should be afforded every opportunity of learning about any facet which may affect that person's fitness for office. (See *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 535, fn. 5; Rest.2d Torts, *supra,* § 652D, com. e.)[20]

 However, the extent to which Diaz voluntarily acceded to a position of public notoriety and the degree to which she opened her private life are questions of fact. (*Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 541.) As student body president, Diaz was a public figure for some purposes. However, applying the three-part test enunciated in *Briscoe,* we cannot state that the fact of her gender was newsworthy per se.

Contrary to defendants' claim, we find little if any connection between the information disclosed and Diaz's fitness for office. The fact that she is a transsexual does not adversely reflect on her honesty or judgment. (Cf. *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20 [plaintiff, a mother and candidate for Alameda City Council, who repeatedly left her minor children unsupervised, could not maintain an action against a newspaper for publishing information taken from police records of her children's criminal behavior]; *Beruan* v. *French* (1976) 56 Cal.App.3d 825 [128 Cal.Rptr. 869] [candidate for secretary-treasurer of union local could not maintain action based on publication of a letter disclosing his six prior criminal convictions].)

Nor does the fact that she was the first woman student body president, in itself, warrant that her entire private life be open to public inspection. The public arena entered by Diaz is concededly small. Public figures more celebrated than she are entitled to keep some information of their domestic activities and sexual relations private. (See Rest.2d Torts, *supra,* § 652D, com. h.)[21]

---

[20]*The Privacy Disclosure Tort, supra,* at page 194.

[21]See *The Right to Speak, supra,* at page 962: "[S]peech necessary for an effective and meaningful democratic dialogue by and large does not require references to the intimate activities of named individuals." (Fn. omitted.)

Nor is there merit to defendants' claim that the changing roles of women in society make this story newsworthy. This assertion rings hollow. The tenor of the article was by no means an attempt to enlighten the public on a contemporary social issue. Rather, as Jones himself admitted, the article was directed to the students at the College about their newly elected president. Moreover, Jones' attempt at humor at Diaz's expense removes all pretense that the article was meant to educate the reading public. The social utility of the information must be viewed in context, and not based upon some arguably meritorious and unintended purpose.

Therefore, we conclude that the jury was the proper body to answer the question whether the article was newsworthy or whether it extended beyond the bounds of decency.

### INSUFFICIENT EVIDENCE OF MALICE

Defendants next urge that the award of punitive damages was improper, since there was insufficient evidence to support a finding of malice on the part of either defendant. The evidence demonstrated that Jones published the article without first contacting Diaz, although he knew that the information contained therein would have a "devastating" impact on her. He testified that he attempted to obtain Diaz's telephone number from his unidentified sources but was unsuccessful. He admitted that he never telephoned the College in order to contact Diaz. Jones also stated that his comment about Diaz's classmates in "P.E. 97" making other shower arrangements was a joke, an attempt to be "flip."

In order to justify the imposition of punitive damages, "the defendant ' ". . . must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]" ' [Citations.]" (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895 [157 Cal.Rptr. 693, 598 P.2d 854], italics omitted; see also *Maheu* v. *Hughes Tool Co.* (9th Cir. 1977) 569 F.2d 459, 480; cf. *Emerson* v. *J. F. Shea Co.* (1978) 76 Cal.App.3d 579, 594-595 [143 Cal.Rptr. 170].)

Viewing the article as a whole, as well as Jones' conduct in preparing the article, we cannot say as a matter of law that there was insufficient evidence to support a finding of malice.

Here Jones knew that Diaz would certainly suffer severe emotional distress from the publicity alone. Nevertheless, he added to the indignity by making Diaz the brunt of a joke. The defendants' knowledge of the extent and severity of plaintiff's injuries is relevant to a finding of malice. (See *Neal* v. *Farmer's Ins. Exchange* (1978) 21 Cal.3d 910, 925 [148 Cal.Rptr. 389, 582 P.2d 980].)

The jury could reasonably have inferred from these facts that Jones acted with the intent to outrage or humiliate Diaz or that he published the article with a conscious disregard of her rights.[22]

The fact that Jones verified the story with unidentified sources does not negate the finding of malice. The jury could well have concluded that Jones' effort to discuss the article with Diaz was de minimis when compared to the magnitude of the expected harm. This is especially true since Jones was under no deadline to publish this article. Under these circumstances, the jury could have reasonably concluded that Jones' conduct evidenced a callous and conscious disregard for Diaz's privacy interests. (See, generally, *Cantrell* v. *Forest Publishing Co.* (1974) 419 U.S. 245, 252 [42 L.Ed.2d 419, 426-427, 95 S.Ct. 465].) Accordingly, the jury acted well within its discretion in awarding punitive damages.

The Oakland Tribune, Inc., was also liable for punitive damages since the newspaper publishing company reviewed and approved Jones' article for publication. (See *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 [169 Cal.Rptr. 691, 620 P.2d 141].)

We are mindful of the dangerous, inhibiting effect on speech and press a large punitive damage award can have. (See *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 349 [41 L.Ed.2d 789, 810-811, 94 S.Ct. 2997].) If upon retrial the plaintiff recovers a judgment, we caution the trial court to scrutinize strictly any award of punitive damages to ensure that it is not used to silence unpopular persons or speech and that it does not exceed the proper level necessary to punish and deter similar behavior. (See *Neal* v. *Farmer's Ins. Exchange, supra,* 21 Cal.3d at p. 928, fn. 13; *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1130, fn. 13.)

EXCESSIVE COMPENSATORY DAMAGE AWARD

Finally, defendants urge that the compensatory damage award was excessive. The jury awarded Diaz $250,000, largely for emotional and psychological injury caused by the article. Diaz's special damages for psychotherapy approximated $800.

---

[22]Respondent also suggests that Jones received the information from Dezzi Woods, director of student affairs at the College. Woods denied this. There is testimony that Jones and Woods had known each other for several years. Also, as part of the College administration, Woods would have been a target of Diaz's accusations of misuse of student funds. Respondent asserts that the reasonable inference could be drawn that Jones agreed to publish this information in order to embarrass Diaz. Based on the evidence before us, such an inference is sheer speculation and is not based on sufficient evidence.

The evidence adduced at trial established that following the publication of the article Diaz became very depressed and withdrawn. She suffered from insomnia and experienced nightmares. She had frequent memory lapses and experienced difficulty in her social relationships. As a result, in September 1978 she began psychotherapy treatments with Allen Sable, Ph.D.

The actual injury involved herein is not limited to out-of-pocket loss. It generally includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." (See *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 350 [41 L.Ed.2d at p. 811].) The harm Diaz alleged to have suffered is not easily quantifiable, and the amount of damages must necessarily be left to the sound discretion of the jury. (See *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

As a rule all presumptions are in favor of the judgment. (*Id.,* at p. 61.) A reviewing court must not interfere with the verdict unless it can be said that it was the result of "passion or prejudice" on the part of the jury. (*Id.,* at p. 64; *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508-509 [15 Cal.Rptr. 161, 364 P.2d 337].)

Here the jury fixed the damages after hearing the evidence and being properly instructed. The evidence of Diaz's emotional distress and suffering was uncontradicted. That Diaz was able to earn high marks in her classes after the incident does not necessarily minimize or negate the emotional trauma she suffered and will continue to suffer.

Also, the trial judge denied a motion for a new trial based on this same issue. While that determination is not binding upon this court, it is entitled to great weight. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 64; *Seffert* v. *Los Angeles Transit Lines, supra,* 56 Cal.2d at p. 506.)

The jury and the trial judge were in the best position to evaluate the scope and severity of Diaz's injuries. They heard the testimony and observed the witnesses. Although the amount of the award is high, it cannot be said that it is so grossly disproportionate, considering the past and future pain and humiliation, as to be excessive as a matter of law.

The judgment is reversed. Appellants and respondent shall each bear their own costs on appeal.

Scott, Acting P. J., concurred.

**FEINBERG, J.**—I concur in the judgment. I agree with the opinion except insofar as the opinion discusses the issues of malice and the excessiveness of the award. Because the judgment is reversed on other grounds, I would not venture into that discussion.

On February 17, 1983, the opinion and judgment were modified to read as printed above.

APPENDIX

## Little Riles sympathy

State Schools Superintendent Wilson Riles can expect little sympathy from blacks if the state Supreme Court fails to reverse Secretary of State March Fong Eu's ruling which removed his name from the June 6 ballot. Riles, who was dropped from the ballot because a required declaration of candidacy did not accompany his $800 filing fee, has been getting the cold shoulder from many of his former black supporters since he, in October 1977, sided with the majority in a 13-12 University of California Regents vote to tighten admission standards.

This vote, along with his public statements defending those black-despised IQ tests, led many brothers and sisters to believe Riles, in a bid to win a third term in office, had taken their support for granted as he pursued more conservative votes.

How ironic it is to see this brother, who shocked even his close friends by his vote against "special admission," now pleading with the court for special considerations for himself.

If the court decrees that Riles' name cannot appear on the ballot, his political future will depend on the outcome of an expensive write-in campaign and it must frighten him a little to know that many of those who may be asked to spell his name correctly on the ballot were educat-

**WILSON RILES**
**An ironic situation**

ed in California schools while he served as superintendent ... All together now: W-I-L-S-O-N R-I-L-E-S.

More Education Stuff: The students at the College of Alameda will be surprised to learn their student body president, Toni Diaz, is no lady, but is in fact a man whose real name is Antonio.

Now I realize, that in these times, such a matter is no big deal, but I suspect his female classmates in P.E. 97 may wish to make other showering arrangements.

Meanwhile, Tana Harris, whose teen-age daughter attends Oakland High, is upset with the way that school's P.E. program is run. Tana reports that the boys who take P.E. between 2:30 and 4:30 are allowed to exercise on Laney College's plush green fields, but the girls, who take P.E. at the same time, are restricted to unsupervised workouts at concrete-covered Franklin Elementary School.

Why? Because Laney's coach Proverb Jacobs, believes the presence of females would distract his boys ... Did I hear anybody say "MOOSE DROPPINGS?"

\* \* \*

What about the city's Hire Oakland plan? James Newman, the city's personnel director, lives in Emeryville. Our town's affirmative action officer, Marcella Ingram, lives in Alamo and Peg Rogers, who is slated to take over Manpower Director Juan Lopez's job (when and if the mayor gets the nerve to promote him to the new post of Economic Development chief), lives in Richmond.

\* \* \*

Does anyone care to know that the Oakland-based Clorox Corporation has a job opening for an affirmative action specialist that was advertised in San Francisco newspapers only?

When I asked why the job was not advertised in this, or any other Eastbay paper, the buck stopped at Clorox's employment manager Bill Vanderbusch who said, "Uh, you go where your best sources are" and "Uh, you take your best shots first and Uh, this is not an entry level position and Uh, you've got me."

By the way the president of Clorox, Robert Shetterly, is also the president of the mayor's Council for Economic Development ... and it is things like this, along with the news that Oaklanders are being discriminated against in Fremont's rental housing market, that prompts me to believe that, by living in this town, I've qualified for yet another minority group.

\* \* \*

Inside Info: The reason some members of the Mule Skinners Democratic Club are so set on endorsing incumbent County Supervisor Fred Cooper over his challenger, attorney Leo Bazile, is because, last year, Cooper loaned the club $500 to pay for the printing of invitations to their annual fund-raising dinner.

\* \* \*

Congratulations to Oakland's Municipal Court Judge Benjamin Travis, who traveled to Chicago last week to receive the William L. Hastie award.

Given by the Black American Law Students Association at their tenth annual convention, this award was bestowed on Travis for his excellence on the bench, as well as his service to the community.