**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of: JTS
CORPORATION,
                              *Debtor,*

---

SUZANNE L. DECKER,
                    *Plaintiff-Appellee,*

            v.

JACK TRAMIEL,
              *Defendant-Appellant,*

            and

ROGER W. JOHNSON; JEAN D.
DELEAGE; AMBER ARBITRAGE LDC,
a private investment fund
incorporated in the Cayman
Islands,
                          *Defendants,*

OFFICE OF THE U.S. TRUSTEE,
                            *Trustee,*

            v.

LIP-BU TAN,
            *Third-party-defendant.*

No. 07-15970

D.C. No.
CV-05-04709-JF

11345

In the Matter of: JTS
CORPORATION,

                 *Debtor,*

---

SUZANNE L. DECKER,

            *Plaintiff-Appellant,*

       v.

JACK TRAMIEL,

           *Defendant-Appellee,*

       and

ROGER W. JOHNSON; JEAN D.
DELEAGE; AMBER ARBITRAGE LDC,
a private investment fund
incorporated in the Cayman
Islands,

              *Defendants,*

OFFICE OF THE U.S. TRUSTEE,

               *Trustee,*

       v.

LIP-BU TAN,

        *Third-party-defendant.*

No. 07-16004

D.C. No.
CV-05-04709-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
November 6, 2009—San Francisco, California

Filed August 10, 2010

Before: Procter Hug, Jr., Pamela Ann Rymer, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Hug

**COUNSEL**

Christian B. Nielsen, San Jose, California, and G. Larry Engel, Morrison & Foerster LLP, San Francisco, California, for the appellant.

Jeffrey C. Wurms, Wendel, Rosen, Black & Dean, LLP, Oakland, California, for the appellee.

**OPINION**

HUG, Circuit Judge:

This case involves a bankruptcy appeal. Appellant Jack Tramiel, a member of the JTS Corporation board of directors, attempted to assist the debtor, JTS Corporation ("JTS"), and purchased real property from JTS. It was held that this purchase was a constructive fraudulent conveyance and that Tramiel was liable for the value of the property. The major issues in this case are what the fair market value of the real property is, whether Tramiel is entitled to an offset for the value he paid for the property as a good faith transferee, and whether Tramiel is entitled to a credit for the amount that his codefendants paid in a settlement agreement. We have jurisdiction under 28 U.S.C. § 158(d)(1), and we affirm.

## I.　Factual Background

In 1994, JTS Corporation ("JTS") was formed to design, manufacture, and market hard disks for personal computers. By 1996, after a contract with JTS was terminated, JTS needed additional working capital to continue. At that time, JTS determined that it was not able to go public to acquire the additional funds that it needed and agreed to merge with Atari Corporation ("Atari") to obtain the funds. Through the merger, JTS received $15 million in cash, $55 million in intel-

lectual property, eight separate real properties located in California and Texas, and a $25 million loan which JTS hoped would carry it through September 1996. In addition, Tramiel, the defendant, who was the chairman of Atari's board of directors, was brought onto the JTS board of directors.

Since the funds acquired through the merger were only intended to carry JTS through September, Virginia Walker, JTS's chief financial officer, began to search for additional capital. After Walker failed to secure funds from several banks, she approached Tramiel and suggested that he buy the eight separate real properties ("real property") that JTS would acquire as a result of the Atari merger. In response, Tramiel suggested that he buy the real property for $10 million and permit JTS to retain an option to repurchase the real property for the same $10 million for one year. If JTS exercised the option, Tramiel would keep the greater of $1 million or the rental income generated by the property for a one-year period.

In June 1996, JTS's board of directors approved the sale of the real property to Tramiel and authorized Walker to work with an attorney to implement the sale. Evidence showed that the JTS board believed that the real property sale to Tramiel was the quickest way of raising the necessary funds to keep the company running and that the repurchase option would allow a year to regain the real property if it decided to do so. One director recalled a discussion that although JTS might receive a greater price for the real property under other circumstances, in light of the immediate need for funds, Tramiel's offer was fair. Tramiel removed himself from the boardroom and abstained from all voting during the sale discussions.

By July 1996, JTS's debt exceeded its assets by $23 million. In September 1996, the real property sale closed. Still struggling, JTS liquidated other property acquired from the merger. Despite these and other efforts, JTS was unable to recover and in November 1998, was forced into bankruptcy

through an involuntary petition. Later, JTS filed a Chapter 11 petition, scheduling assets of $4.2 million and liabilities of $136 million. In 1999, the case converted to Chapter 7.

## II.   Procedural Background

In 2003, the trustee, Suzanne L. Decker filed a complaint against JTS's directors (including Tramiel), its attorneys, and a shareholder, alleging fraudulent conveyance and other claims. In 2004, Tramiel's co-defendants, *i.e.*, the attorney defendants and two members of the JTS board of directors, reached a settlement with Decker in which they agreed to pay the JTS bankruptcy estate $4.5 million. The bankruptcy court issued an order approving the settlement and trial proceeded against only Tramiel.

In 2005, the bankruptcy court held *inter alia* that the sale of the real property to Tramiel was avoided as a constructive fraudulent conveyance under 11 U.S.C. § 544(b) of the Bankruptcy Code and California Civil Code § 3439.04. The bankruptcy court stated that under § 544(b) a trustee may avoid transfers of a debtor's property that would be avoidable under state law. Under California Civil Code § 3439.04, a transfer is avoidable if the debtor completed the property transfer without receiving a reasonably equivalent value in exchange for the property and the debtor intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay. In determining reasonably equivalent value, the bankruptcy court found that the fair market value of the eight separate real properties which Tramiel bought from JTS was $15,760,000 if the properties had been individually exposed to the market for one year and sold separately. Because the property was sold as a bundled portfolio and it was a quick sale, the court held that a 5% reduction should apply for a quick sale and a 20% reduction should apply for a bundled sale. Thus, the bankruptcy court held that the reasonably equivalent value of the real property was $11,820,000.

The bankruptcy court determined that the value of the option to repurchase the real property was $432,815. The bankruptcy court stated that the value of the repurchase option is determined by subtracting the strike price of the repurchase option from the fair market value of the real property. The bankruptcy court held that the stated strike price, $10 million, should be added to the loss of rental income for the real property for one year, which was $1,387,185, to equal a total $11,387,185 strike price. The bankruptcy court subtracted the strike price of $11,387,185 from the reasonably equivalent value of the real property, *i.e.*, $11,820,000, and held that the value of the repurchase option was $432,815. The bankruptcy court held that Tramiel paid a total consideration of $10,432,815 for the real property by adding the value of the repurchase option to the $10 million purchase price.

In addition, the bankruptcy court held Tramiel was a good faith transferee under California Civil Code § 3439.08(d)(3). The bankruptcy court determined that under California Civil Code § 3439.07(a)(1) the ability of a trustee to avoid a transfer is subject to the limitations under California Civil Code § 3439.08. Under § 3439.08(d)(3), a good faith transferee is entitled to a reduction in liability to the extent of the value given to the debtor. The bankruptcy court held that Tramiel was a good faith transferee entitled to a reduction of the $10 million consideration paid for the real property plus the value of the repurchase option, *i.e.*, $432,815. The bankruptcy court held that subtracting the good faith transferee reduction of $10,432,815 from the $11,820,000 reasonably equivalent value left Tramiel with a liability of $1,387,185. After determining that Tramiel was not entitled to a settlement credit, the bankruptcy court held that Tramiel's liability was $1,387,185 plus interest.

Tramiel filed a motion in bankruptcy court to amend the judgment in order to grant him a settlement credit under California Civil Procedure Code § 877. The bankruptcy court amended its judgment and held that Tramiel was entitled to a

settlement credit against his liability in the amount paid by the settling defendants to the bankrupt estate, *i.e.*, $4.5 million. Because this settlement credit exceeded Tramiel's liability, the bankruptcy court held that Decker could not recover any amount from Tramiel.

On appeal, the district court affirmed in part and reversed in part the bankruptcy court's judgment. The district court affirmed the bankruptcy court's determination that Tramiel was liable for constructive fraudulent conveyance under § 544(b) and § 3439.04(a). The district court held, however, that the fair market value of the real property was $15,760,000 and the rents were $1,387,185, creating a total fair market value of $17,147,185 for the real property. Unlike the bankruptcy court, the district court concluded that the appropriate measure of liability is the fair market value.

The district court affirmed the bankruptcy court's determination that Tramiel was a good faith transferee under California Civil Code § 3439.08(d)(3) and thus reduced his liability by $10,432,815, *i.e.*, the $10 million purchase price and value of the repurchase option, $432,815. The district court subtracted $10,432,815 from the fair market value of the real property, *i.e.*, $17,147,185, and held that Tramiel's liability was $6,714,370.

The district court reversed the bankruptcy court's holding that Tramiel was entitled to a settlement credit of the $4.5 million paid by his co-defendants. The district court held that under California Civil Procedure Code § 877, a settlement bars nonsettling defendants from seeking contribution from the settling defendants, but the nonsettling defendant's liability may be reduced by the settlement amount if all of the defendants are joint tortfeasors. The district court held that Tramiel was not a joint tortfeasor because (1) there was no evidence that Tramiel had requested a finding of joint liability; (2) the written settlement agreement between the co-defendants and bankrupt estate allocated liability for each co-

defendant for certain torts and did not address the fraudulent conveyance; and (3) the written settlement agreement contained an integration clause, stating that the agreement was the complete expression of the parties' intent. Thus, the district court held that Tramiel was liable for the fraudulent conveyance in the amount of $6,714,370.

## III. Discussion

### A. Standard of Review

We review de novo a district court's decision on appeal from a bankruptcy court. *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009). We apply the same standard of review applied by the district court. *Id*. We review a bankruptcy court decision independently and without deference to the district court's decision. *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004). "The bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo." *Id.* (citing *Galam v. Carmel (In re Larry's Apt., L.L.C.)*, 249 F.3d 832, 836 (9th Cir. 2001)). We must accept the bankruptcy court's findings of fact, unless "the court is left with the definite and firm conviction that a mistake has been committed." *Greene*, 583 F.3d at 618. "Mixed questions of law and fact are reviewed de novo." *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998).

### B. Fraudulent Conveyance & Value of Real Property

**[1]** Tramiel argues that the district court erred when it determined with regard to the fraudulent conveyance claim that the value of the real property was its fair market value $17,147,185. Under § 544(b)(1) of the Bankruptcy Code, a "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." Under California Civil Code § 3439.04(a), a transfer is avoidable if the debtor made the transfer without receiving a reasonably equivalent value in

exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Reasonably equivalent value is the value of the property on the date of the transfer from the perspective of the creditors. *In re Prejean*, 994 F.2d 706, 708 (9th Cir. 1993); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 & n.5 (5th Cir. 1993). Courts may consider the fair market value or what would be the fairly equivalent value of the property, taking into consideration all of the specific circumstances of each case affecting the value of the asset. *Hansen v. Cramer*, 245 P.2d 1059 (Cal. 1952); *Bailey v. Leeper*, 298 P.2d 684 (Cal. Ct. App. 1956). A finding of what constitutes the value of real property is a finding of fact which may be reversed only if it is shown that it was clearly erroneous. *In re Arnold*, 85 F.3d 1415, 1421 (9th Cir. 1996); *In re Tuma*, 916 F.2d 488, 491 (9th Cir. 1990).

**[2]** In this case, we conclude that the district court erred in holding that the fair market value which it fixed at $17,147,185 was determinative. The bankruptcy court's finding that the reasonably equivalent value was $11,820,000 was not clearly erroneous. The bankruptcy court found that the fair market value of the property was $15,760,000 without applying quick and bundled sale reductions. Both parties' experts agreed that $15,760,000 would be the value of the property if it had been sold individually and exposed to the market for a year and that this was thus an appropriate starting point. The bankruptcy court then applied reductions of 5% for a quick sale and 20% for a bundled sale to the $15,760,000, reducing the fair market value to $11,820,000 (the reasonably equivalent value). This was not clearly erroneous. Evidence showed that JTS wanted immediate cash and was willing to take a reduced price for the real property to obtain the funds quickly. JTS wanted a quick and bundled sale and even Decker's expert agreed that reductions for a quick and bundled sale were proper if a seller required those terms. For a bundled sale, Tramiel's expert testified that a 20 to 30% reduction was

proper and Decker's expert testified that a 5.5% reduction was proper. The bankruptcy court found Tramiel's expert more persuasive and imposed the lowest percentage that he recommended. For a quick sale, Decker's expert testified that if a discount was applied that he would apply 1% per month, *i.e.*, a total of five percent. The bankruptcy court applied this percentage. No evidence shows that the bankruptcy court's reasonably equivalent value determination of $11,820,000 was clearly erroneous. Accordingly, we disagree with the district court's determination based entirely on fair market value, and affirm the bankruptcy court's reasonably equivalent value determination. *In re Tuma,* 916 F.2d at 491 (holding bankruptcy judge's determination was not clearly erroneous even though there were many different methods of determining value); *Sammons v. Comm'r,* 838 F.2d 330, 334 (9th Cir. 1988) (holding court did not abuse its discretion in rejecting certain appraisals regarding valuation); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (stating if there are two views of the evidence, a court's choice between them is not clearly erroneous). Accordingly, we hold, as the bankruptcy court held, that the reasonably equivalent value of the real property was $11,820,000.

**[3]** The bankruptcy court also did not clearly err in determining that the fair market value of the repurchase option was $432,815. The question of whether JTS received a reasonably equivalent value also turns on the value of the repurchase option that Tramiel gave to JTS. Tramiel's expert correctly testified that the value of the repurchase option was the difference between the reasonably equivalent value of the property and the fixed strike price. *See In re Calvillo*, 263 B.R. 214 (W.D. Tex. 2000). Here, the bankruptcy court properly concluded that the strike price was $10 million plus $1,387,185 for rents, for a total of $11,387,185. Subtracting that total from the reasonably equivalent value of $11,820,000 equaled a total of $432,815 for the value of the repurchase option. Because there is no evidence that this determination was

clearly erroneous, the bankruptcy court properly found that the value of the repurchase option was $432,815.

## C.    Good Faith Transferee

Decker argues that the bankruptcy and district courts erred by holding that Tramiel was a good faith transferee under California Civil Code § 3439.08(d)(3) and reducing his liability by the value he paid for the property, *i.e.*, $10,432,815. Decker argues that § 544(b) and § 550(a) claims are only subject to state laws that determine voidability. Decker argues that § 3439.08(d)(3) does not determine voidability and is therefore inapplicable to § 544(b) and § 550(a) claims.

### i.    Sections 544 and 550 of the Bankruptcy Code

[4] Under § 544(b) and § 550(a) of the Bankruptcy Code, a trustee may avoid a fraudulent transfer of property if that transfer is voidable under applicable state law. *In re United Energy Corp.*, 944 F.2d 589, 593 (9th Cir. 1991). Fraudulent transfer law has been a part of debtor-creditor relations since 1571. 5 *Collier on Bankruptcy* § 548.01[1][a], [b] at 548-8, 11 (Alan N. Resnick & Henry J. Sommer 16th Ed.). Such laws were enacted to allow a creditor to avoid an improper transaction by a debtor who attempts to unjustly reduce assets and avoid his creditors' claims. *Id.* Prior to 1938, however, federal bankruptcy law only addressed a small number of fraudulent transfer cases in which there was actual intent to defraud and the transfer occurred within four months of the bankruptcy. *Id.* at 548-11-12. In 1938, Congress enacted amendments to the Chandler Act and fully absorbed fraudulent transfer laws into federal bankruptcy law. *Id.* These 1938 amendments "brought the full panoply of fraudulent transfer law into federal law, including the ability to avoid constructively fraudulent transfers." *Id.* "Given the elemental nature of fraudulent transfer law, however, there was no preemption [of states] intended, and states (as well as the federal government) con-

tinued to adapt parts of fraudulent transfer law for their own purposes." *Id.* at 548-12.

Sections 548 and 544 of the Bankruptcy Code were enacted by Congress to allow a trustee the option of avoiding a fraudulent transfer under either state law or federal law. Section 548 was adopted in 1978. Section 548 allows a trustee to avoid a transfer if it is made within two years of filing a bankruptcy petition and the debtor either had actual intent to defraud or received less than reasonably equivalent value in exchange for the transfer. 11 U.S.C. § 548(a)(1)(A), (B). Subsection (c) of § 548 provides that a trustee's recovery may be reduced by the value given for the transfer if the transferee made the transfer in good faith.

In 1978, § 544 of the Bankruptcy Code was enacted in recognition of the growth of state fraudulent transfer laws. *Collier on Bankruptcy* § 548.01[2] at 548-12. Section 544 enables a bankruptcy trustee to avoid any transfer of property that an unsecured creditor with an allowable claim could have avoided under applicable state law. 11 U.S.C. § 544(b)(1); Alan Resnick, *Finding the Shoes That Fit: How Derivative is the Trustee's Power to Avoid Fraudulent Conveyances Under Section 544(b) of the Bankruptcy Code?*, 31 Cardozo L. Rev. 205 (2009). The purpose of this section was to recognize the body of state laws addressing fraudulent transfers and allow a trustee the choice of avoiding transfers under § 544 and the applicable state fraudulent transfer law, or under only federal law pursuant to § 548. *Collier on Bankruptcy* § 548.01[2] at 548-12.

**[5]** Section 550 of the Bankruptcy Code authorizes a trustee, after avoiding a fraudulent transfer under § 544 or § 548, to recover the property transferred or the value of the property for the benefit of the bankrupt estate. 11 U.S.C. § 550(a). Section 550(a) provides that "to the extent that a transfer is avoided under section 544 . . . [ or] 548 . . . the trustee may recover, for the benefit of the estate, the property

transferred, or, if the court orders, the value of such property." The purpose of § 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *In re Acequia*, 34 F.3d 800, 812 (9th Cir. 1994) (internal quotation marks omitted). The primary goal is equity and restoration, *i.e.*, "putting the estate back where it would have been but for the transfer." *Collier on Bankruptcy* § 550.02[3][a] at 550-10; 11 U.S.C. § 550(e)(1)(A); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1266 (10th Cir. 2004); *In re American Way Serv. Corp.*, 229 B.R. 496, 530-31 (Bankr. S.D. Fla. 1999). Abiding its equitable underpinnings, a trustee's recovery under § 550 is limited if the transferee took the transfer for value in good faith without knowledge of its voidability. 11 U.S.C. § 550(b)(1). A good faith transferee is also permitted under § 550 to recover the value of any improvements that were made after the transfer. 11 U.S.C. § 550(e)(1)(A).

### ii.   Cases Involving Sections 544 and 550

[6] The Supreme Court and this court have interpreted claims under § 544 and § 550 of the Bankruptcy Code to require that once avoidance is shown, the trustee's recovery cannot be limited in certain situations. *In Moore v. Bay*, 284 U.S. 4, 5 (1931), the Supreme Court addressed whether a bankruptcy trustee's recovery was limited on a fraudulent transfer claim under § 70e of the Bankruptcy Act, the precursor to § 544 of the Bankruptcy Code.[1] 11 U.S.C. § 110e (1976) (repealed); 11 U.S.C. § 544(b), Notes (stating § 544(b) is derived from former § 70e and that § 544(b) follows the rule of *Moore v. Bay*); *Sherwood Partners, Inc. v. Lycos, Inc.*,

---

[1]Section 70e(1) provided that a "transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this Act, shall be null and void as against the trustee of such debtor." *Miller v. Sulmeyer*, 263 F.2d 513, 515 (9th Cir. 1959)

394 F.3d 1198, 1201 (9th Cir. 2005) (stating that § 70e is the precursor of § 544(b)). In *Moore*, the "bankrupt executed a mortgage of automobiles, furniture, show room and shop equipment" and later recorded the mortgage. 284 U.S. at 4. Under California Civil Code § 3440, a transfer of personal property made by one who has the property and does not immediately deliver it, was void against those who were creditors at the time of the transfer and those who became creditors while the transferor still possessed the property. Because of § 3440's application, the mortgage was void against creditors who were such on the date of the mortgage and those who became creditors between the date of the mortgage and the date it was recorded. *Id.* at 4-5. The Supreme Court, thus, had to address the issue of whether the mortgage was also void against creditors who gave the bankrupt credit after the date the mortgage was recorded. *Id.* at 5.

The Supreme Court held that for fraudulent transfer claims asserted by a bankruptcy trustee under § 70e "the right of the trustee to recover is dependent upon just one creditor with a cause of action and [is] not dependent at all upon the size of the creditor's claim against the debtor." *Collier on Bankruptcy* § 544.06[4] at 544-23. The Supreme Court held that a trustee could "avoid an entire transfer without regard to the size of the claim of the unsecured creditor whose rights and power the trustee [is] asserting." Helen Ryan Frazer, Laurel R. Zaeske, and Lynda T. Bui, *Fraudulent Transfer: Litigation Under the Bankruptcy Code and State Law*, 29 Cal. Bankr. J. 255, 269 (2007) (internal quotation marks omitted). "In other words, an entire transfer can be set aside even though the creditor's claim is nominal and, moreover, the recovery of the trustee is for the benefit of all creditors including those who had no right to avoid the transfer." *Id.* (internal quotation marks omitted). Thus, the Supreme Court held that the creditor with a cause of action under § 70e would share any recovery equally with unsecured creditors who otherwise could not recover. *Moore*, 284 U.S. at 5.

Following the rule of *Moore v. Bay*, in *Miller v. Sulmeyer*, 263 F.2d 513, 516 (9th Cir. 1959) we held that a bankruptcy trustee asserting a claim under § 70e of the Bankruptcy Act could recover on a chattel mortgage even though under California Civil Code § 2957 the mortgage was void as against any creditor after the date that the mortgage was recorded. In *Miller*, the Millers sold a business to the now bankrupt Delcon Corporation. *Id.* at 514. In return, the Millers "took back from Delcon a purchase money mortgage on chattels transferred to Delcon." *Id.* The Millers did not record the mortgage for 79 days. *Id.* A creditor filed a claim against the mortgage for $8,906.95 during that time. *Id.* The Millers later foreclosed on the mortgage, repossessed the chattel under the terms of the mortgage, and resold the property for $82,500. *Id.* Delcon was bankrupt at the time of the sale. *Id.*

Under California Civil Code § 2957, the mortgage and the Miller's receipt of the $82,500 was void as against any creditors whose debts arose after the date that the mortgage was recorded. *Id.* at 515. We held, however, that § 70e controlled, that the facts were similar to *Moore, i.e.,* the cases addressed chattel mortgages and § 70e claims, and stated that we were unable to distinguish *Moore* from that case. *Id.* at 515. We held therefore that the trustee was entitled to the $82,500, despite the invalidity of a creditor's claim against the Millers under California law. *Id.*

Many years later in *In re Acequia, Inc.,* 34 F.3d 800, 804 (9th Cir. 1994), we addressed whether a bankruptcy trustee's recovery for fraudulent transfers under § 544(b) (which replaced former § 70e) and § 550(a) could be limited to the amount of the unsecured claims against the bankrupt estate. In *Acequia*, Vernon Clinton formed Acequia, Inc. to conduct farming operations on his land in Idaho. *Id.* Later, Acequia filed for bankruptcy. *Id.* The bankruptcy trustee for Acequia filed suit, asserting that Clinton had fraudulently conveyed Acequia's assets to himself and was liable under § 544(b) and § 550. *Id.* at 803-04, 808. Clinton argued that the § 544(b)

claim was "moot because the corporation [had] paid all [of its] unsecured creditors in its plan of reorganization." *Id.* at 807.

In *Acequia*, we held that it was improper to limit a trustee's recovery under § 544(b) and § 550(a) based on the total amount of unsecured claims against the bankrupt estate. *Id.* We held that the existence of a § 544(b) claim requires only that one creditor exist at the time that the transfer was made and that that creditor have an actionable claim against the estate. *Id.* We held that a trustee must establish the following to recover under § 544(b) and § 550(a): 1) fraud or illegality under applicable law; 2) voidness of the transfer under § 544(b) and applicable law; and 3) liability of the particular transferee under § 550. *Id.* at 809. Once fraud and voidness are shown, a trustee may recover under § 550 to the extent it "benefits the estate," *i.e.*, even if there is a right to avoid a transfer, it does not mean that a right to recover on every transfer is automatic. *Id.* at 811.

Applying such rules in *Acequia*, we held that the bankruptcy trustee had a right to assert claims under § 544(b) because there were unsecured claims against the estate at the time that bankruptcy was filed. *Id.* at 807. We held that the trustee was entitled to fully recover, even if it received a windfall, because (1) recovery would ensure that Acequia would perform its obligations under its reorganization; (2) recovery would allow the estate to be reimbursed for pursuing the fraudulent transfer action; and (3) Clinton had actual fraudulent intent and did not deserve between the two parties to receive a benefit. *Id.* at 811-12.

### iii.  Good Faith Transferee

**[7]** The trustee's position is that the interplay of §§ 544(b) and 550 requires full avoidance, and that California Civil Code § 3439.08(d)(3) is not applicable because Tramiel is not a good faith purchaser and § 3439.08(d)(3) cannot limit the

transferee's avoidance. Both the bankruptcy court and the district court thought otherwise, as do we: § 3439.07, which allows relief of avoidance "to the extent necessary to satisfy the creditor's claim" is expressly made "subject to the limitations in Section 3439.08" — and those limitations include a reduction for what a good faith transferee paid.

While we held in *Miller* and *Acequia* that a trustee's recovery cannot be limited by certain factors when asserting a § 544(b) claim, those cases did not address the issue of good faith or this statutory provision, and we have held in other cases that certain factors — like good faith — apply as a matter of law when such a claim is raised. In *In re Agricultural Research and Technology Group, Inc.* ("*Agretech*"), 916 F.2d 528, 531 (9th Cir. 1990), we addressed whether the bankruptcy trustee for Agricultural Research and Technology Group, Inc. ("Agretech") could avoid fraudulent transfers made by Agretech to Palm Seedlings Partners-A ("Palm") under § 544(b) and § 550(a) and whether Palm was a good faith transferee under state law. *Id.* at 539. Agretech was a Hawaii corporation that took plant seeds, cultivated them and marketed the mature plants. *Id.* at 532. Several shipments of seeds were made to Agretech pursuant to an agreement with Palm in which Agretech paid for the seeds and Palm agreed to pay a certain amount for the plants once they were grown. *Id.* at 533. Throughout its business dealings, however, Agretech was running a Ponzi scheme and distributing "funds to earlier investors from the receipt of monies from later investors." *Id.* at 536. Agretech's president plead guilty to operating a Ponzi scheme for several years, including years spanning the Palm agreement. *Id.* at 533.

We held that the transfers from Agretech to Palm were fraudulent and avoidable under § 544(b) and Hawaii Revised Statute § 651C-4(a)(1) and that Palm was not a good faith transferee under Hawaii Revised Statute § 651C-8. Under § 651C-4(a), a transfer is fraudulent as to a creditor if it was made with the intent to defraud or without receiving a reason-

ably equivalent value in exchange. Under § 651C-8, any transferee who received a transfer in good faith may recover the value he gave in a transaction which is avoidable under Hawaii Revised Statute § 651C-4(a)(1). *Id.* at 535. Because the record demonstrated that Agretech had actual intent to defraud its creditors by transferring the sums, we held that the transfers were avoidable under § 651C-4(a)(1). *Id.* at 538-39. We concluded that Palm did not constitute a good faith transferee under § 651C-8(a) because it should have known that Agretech was running a Ponzi scheme based on statements it made to Palm and from Agretech's willingness to accept little value in exchange for the transfer. *Id.* at 538-540. We held that this evidence showed Palm "not only knew of the fraud, but was an active participant." *Id.* at 539. Thus, Palm was not a good faith transferee.

In *In re AFI Holding, Inc.* ("*AFI*"), 525 F.3d 700, 701-02 (9th Cir. 2008), we addressed whether the trustee for Advance Finance Incorporated ("AFI") could avoid transfers from AFI to one of its investors, Keith Mackenzie, under § 548 and § 550 and whether Mackenzie was a good faith transferee under California Civil Code § 3439.08. *Id.* at 708-09. Mackenzie invested $73,400 with AFI in 1995 and 1996 as a purported limited partner in exchange for a proportionately reduced restitution claim. *Id.* at 702, 708. Mackenzie withdrew from AFI and received $89,824.18, which constituted his initial principal of $73,400 and a fictitious gain on his investment of $16,424. *Id.* at 702. Later, the founder of AFI pled guilty to federal securities and mail fraud charges and admitted to operating a Ponzi scheme. *Id.* at 704. The bankruptcy trustee sought to avoid the $89,824.18 transfer from AFI to Mackenzie and Mackenzie argued that he was a good faith transferee and entitled to a reduction on that basis. *Id.*

We held that the transfer from AFI to Mackenzie was an actual fraudulent transfer under § 548 and that the good faith transferee exception under California Civil Code § 3439.08 was not barred as a matter of law. *Id.* at 704-09. With regard

to the fraud, we held that evidence of the Ponzi scheme and the guilty plea by AFI's founder sufficiently established actual intent to defraud creditors. *Id*. at 704. Regarding the good faith exception under § 3439.08, we stated that Mackenzie had exchanged a reasonably equivalent value for the transfer so that the good faith exception for the fraudulent transfer was not barred as a matter of law. *Id.* at 709. We held that if on remand the district court determined that Mackenzie took the transfer in good faith, then Mackenzie would be entitled to the amount he gave AFI, *i.e.*, $73,400, but not to the fictitious gain of $16,424.18. *Id*. at 709.

**[8]** In this case, based on *Acequia, Agretech* and *AFI*, we hold that the trustee may recover under § 544(b) and § 550, but that Tramiel has shown he is a good faith transferee under California Civil Code § 3439.08. First, the trustee has established recovery under the three-part *Acequia* test. *Acequia*, 34 F.3d at 811. The *Acequia* test requires that the trustee show (1) fraud or illegality; (2) voidness of the transfer under § 544(b) and applicable law; and (3) liability of the particular transferee under § 550. *Id*. at 809. In this case, the trustee has satisfied steps one and two by showing that the real property transfer from JTS to Tramiel was a constructive fraudulent conveyance and was void under § 544(b) and California Civil Code § 3439.04(a). The trustee has also shown that Tramiel has liability for the transfer, but the amount of recovery must be calculated to the extent that it benefits the estate, as § 550 expressly requires, and must further the intent of § 550 to promote equity and restore the estate to its prior condition.

**[9]** To calculate the amount of recovery and abide by the intent of § 550, we hold that California Civil Code § 3439.08(d), the good faith transferee exception, applies in § 544(b) cases and, if satisfied, allows for a reduction in the trustee's recovery. Section 3439.08(d) provides that "[n]otwithstanding voidability of a transfer or an obligation under this chapter, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer

or obligation, to . . . [a] reduction in the amount of the liability on the judgment." Here, the record establishes that Tramiel was objectively a good faith transferee who gave JTS $10 million in exchange for real property to enable JTS to survive financially. JTS had no source for capital and it was JTS who approached Tramiel and suggested that they do the real property transfer. To protect the company, Tramiel agreed to the deal, but gave JTS an option to repurchase the property at the exact same price for a period of a year. If JTS exercised the option, Tramiel would keep the greater of $1 million or the property's rental income and retain a return on his investment. Tramiel instructed board members that they should get an independent appraisal of the property and removed himself from all board discussions and votes regarding the transfer. Tramiel was not aware of any appraisals of the property and testified that he may have stated they were worth $12 to $13 million at the time of the merger. Finally, JTS board members stated that given the circumstances, and JTS's dire need for cash, the real property transaction was fair.

**[10]** In total, the evidence shows that Tramiel entered the transaction in good faith to enable the company to survive and proposed a repurchase option to protect the company. Because Tramiel is thus a good faith transferee under California Civil Code § 3439.08(d), his liability of $11,820,000 is reduced by any value that he gave in exchange for the real property. Tramiel gave $10 million to purchase the property and a repurchase option valued at $432,815, meaning that the total consideration provided for the property was $10,432,815. Deducting the amount of consideration, *i.e*. $10,432,815, from the amount of liability, *i.e*., $11,820,000, leaves Tramiel with a liability of $1,387,185.

This conclusion effectuates the intent of § 550 to restore the bankrupt estate to the financial condition it enjoyed prior to the transfer. *Acequia*, 34 F.3d at 812. Allowing the estate to profit by taking value that should be returned to a good faith transferee does not promote the purpose of § 550 to restore

equity. *Id*. Moreover, allowing state law good faith transferee exceptions in cases asserting § 544 claims permits a symmetry with the Bankruptcy Code: § 548 of the Bankruptcy Code, which voids fraudulent transfers under federal law, allows for a reduction in recovery due to a good faith transferee. Section 544(b), which allows for avoidance of fraudulent transfers under state law, should reflect this symmetry.

Thus, we hold that Tramiel is a good faith transferee under California Civil Code § 3439.08(d) and entitled to a reduction in liability of $10,432,815.

## D.    Settlement Credit

**[11]**  Tramiel argues that he is entitled to a settlement credit pursuant to California Civil Procedure Code § 877 in the amount that his co-defendants paid to the estate to settle their claims, which was $4.5 million. Under § 877, where a covenant not to sue is given in good faith before a judgment "to one or more of a number of tortfeasors claimed to be liable for the same tort. . .it shall reduce the claims against the others in the amount stipulated by. . .the covenant, or in the amount of consideration paid for it whichever is greater." Section 877 allows joint tortfeasors to equitably share damages if they have committed the same tort. *Wakefield v. Bohlin*, 145 Cal. App. 4th 963, 979 (Cal. Ct. App. 2006), *overruled on other grounds by Goodman v. Lozano*, 47 Cal. 4th 1327, 1334 (2010); *May v. Miller*, 228 Cal. App. 3d 404, 407 (Cal. Ct. App. 1991). Its fundamental purpose "is to preclude a double recovery arising out of the same wrong." *Vesey v. United States*, 626 F.2d 627, 633 (9th Cir. 1980).

### i.    Same Injury

**[12]**  Whether individuals are joint tortfeasors under § 877 depends upon whether they caused "one indivisible injury" or "the same wrong." *May,* 228 Cal. App. 3d at 409-10; *Lafayette v. County of Los Angeles*, 162 Cal. App. 3d 547, 554 (Cal.

Ct. App. 1984). The "same wrong" may emanate from two successive independent torts and does not require unity of purpose, action, or intent by the two or more tortfeasors. *Id.* at 554; *Kohn v. Superior Court of San Mateo*, 142 Cal. App. 3d 323, 328 (Cal. Ct. App. 1983). Also, the plaintiff need not allege the same tort against the tortfeasors, but must only claim that the tortfeasors caused the same harm. *Lafayette*, 162 Cal. App. 3d at 555-56.

In *Lafayette v. County of Los Angeles*, 162 Cal. App. 3d 547 (1984), for example, plaintiff sued the county for medical malpractice and his attorney for legal malpractice in the handling of his medical malpractice action. *Id.* at 550, 553. The attorney settled before trial and paid plaintiff $15,000. *Id.* at 554. At trial, the jury found that the county was liable in the amount of $84,000. *Id.* at 550. The court held that plaintiff's injury by the county and his attorney were the "same wrong" and allowed a reduction by the $15,000 settlement paid to plaintiff by his attorney under § 877. *Id.* at 555. The court stated that "two tortfeasors can both be liable for the same tort without being joint tortfeasors in the sense of concert of action and unity of purpose." *Id.* at 554. The court explained that

> In *Helling v. Lew* (1972) 28 Cal. App. 3d 434, 104 Cal. Rptr. 789, tortfeasor 1 caused injury to plaintiff who was required to seek medical care from tortfeasor 2 who malpracticed the plaintiff. The plaintiff, of course would be entitled under recognized principles of proximate causation to recover against tortfeasor 1 for the damages caused by tortfeasor 2. Therefore, an offset was allowed to tortfeasor 1 for a settlement made with tortfeasor 2. Specifically, tortfeasor 1 and tortfeasor 2 were both liable for damages from the second tort-medical malpractice. To avoid double recovery, tortfeasor 1 was entitled to an offset for the settlement with tortfeasor 2.

*Id.* at 555 (internal quotation marks omitted). The court also stated that it is not necessary that plaintiff allege the same tort against the joint tortfeasors. *Id.* at 555-56. The court held that § 877 applies if the plaintiff claimed that the tortfeasors were liable for the same wrong and here plaintiff "clearly claimed Rose was liable for the damages resulting from the County's tort." *Id.* at 556.

Similarly, in *Knox v. County of Los Angeles*, 109 Cal. App. 3d 825 (Cal. Ct. App. 1980), plaintiffs who claimed that they were unlawfully arrested in front of a market while picketing it sued the market and the county for damages. *Id.* at 828-29. Plaintiffs alleged they were arrested at the instigation and direction of the market defendants which then proximately caused the unlawful arrests and false imprisonment. *Id.* at 829. Prior to trial, plaintiffs settled with the market for $4,000 per plaintiff. *Id.* at 830-31. At trial, the jury found that the county was liable for $17,500 damages to each plaintiff. *Id.* The court held that the county was entitled to a setoff of $4,000 per plaintiff under § 877 because both parties were claimed to have been liable for the unlawful arrests and false imprisonment. *Id.* at 831-32.

In *Kohn v. Superior Court of San Mateo*, 142 Cal. App. 3d 323, 328 (Cal. Ct. App. 1983), the plaintiffs sued a pest control company, construction company, and the sellers of a house for negligence and fraud. Plaintiffs bought a house for $60,500 and the sellers failed to disclose that the home had been involved in a fire. *Id.* at 325. The construction company defendant repaired the fire damage to the home and the pest control company conducted an inspection while the house was in escrow. *Id.* at 325. Prior to trial, the pest control company and construction company settled with plaintiff with each defendant paying $6,000. *Id.* at 325. Plaintiffs sought $500,00 from the remaining seller defendants who attacked the validity of the settlement agreement because it was a markedly low amount. *Id.*

The court held that the settlement agreement was valid and that § 877 applied. *Id.* at 328-30. The court held that the "alleged tortious activities by the contractor, pest control inspector and seller were not independent, but combined to create one indivisible injury which took place when the sale [of the house] was consummated." *Id.* at 329. The court also held that although plaintiff alleged that the settling defendants were liable for failure to inspect and repair properly, and alleged that the nonsettling sellers were liable for fraud, that did not alter the outcome since there was but one injury, *i.e.*, the purchase of a home which was worth less than its value. *Id.* at 328-29.

In this case, the bankruptcy court properly determined that Tramiel and the settling co-defendants committed the "same injury" pursuant to § 877. The trustee asserted in her complaint that Tramiel was liable for breach of fiduciary duty based on the real property transfer and constructive fraudulent conveyance based on the real property transfer. The trustee asserted that the settling attorney defendants were liable for *inter alia* breach of fiduciary duty and aiding and abetting in breach of fiduciary duty related to the real property transfer. The trustee asserted that the settling director defendants were liable for knowingly approving the real property transfer despite knowledge that it was fraudulent. In the complaint, the trustee alleged that all defendants were jointly liable for the concerted and separate acts which culminated in the real property transfer to Tramiel and that they knew of the disparity between the purchase price and fair market value of the real property.

**[13]** Here, the trustee alleged Tramiel and the settling defendants combined to carry out the same injury, *i.e.*, the fraudulent transfer of the real property. The settling attorneys, other directors, and Tramiel all acted to further the transaction which is the harm that the trustee alleges. It is irrelevant that the trustee alleged different torts against Tramiel and the settling defendants since their concerted conduct produced the same injury and the decision to sell the property by the set-

tling directors with the aid of the attorneys proximately caused the actual harm of the real property transaction. *See Knox*, 109 Cal. App. 3d at 832-33; *Kohn*, 142 Cal. App. 3d at 329; *Lafayette*, 162 Cal. App. 3d at 555-56. Thus, the bankruptcy court properly found that § 877 was applicable in this case because the separate conduct of Tramiel and the settling defendants combined to create the same indivisible injury, which was the sale of the real property at less than its value.

### ii.   Amount of Offset

**[14]** Under § 877, the amount of plaintiff's recovery is " 'diminished only by the amount plaintiff actually recovered in a good faith settlement rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury.' " *Knox*, 109 Cal. App. 3d at 834 (quoting *McGee v. Cessna Aircraft Co.*, 82 Cal. App. 3d 1005, 1022 (1978)). In *Alcal Roofing & Insulation v. Superior Court of San Mateo*, 8 Cal. App. 4th 1121, 1123 (Cal. Ct. App. 1992), a condominium association asserted a construction defect case against the developer, roofing-related subcontractors, and a roofer. All parties agreed to a settlement amount of $4.4 million, except the roofer. In the settlement agreement, the parties allocated $100,000 for roofing claims. The roofer argued that the court should not have approved the settlement because this was far less than his possible liability and would lessen the amount of offset applicable to any judgment against him. The court held that if each settling defendant allocated its settlement to primarily nonroofing issues the roofer could "obtain an offset for the settlement of each of the other defendants, limited only by the amount of each settlement." *Id*. at 1127.

Similarly, in *L.C. Rudd & Son, Inc. v. Superior Court of Alameda*, 52 Cal. App. 4th 742 (Cal. Ct. App. 1997), a homeowners association brought a construction defects case against various developers, a contractor, and a rough grader. There, the developers agreed to "settle with plaintiff for a total cash consideration of $90,000 plus assignment of developers'

indemnity rights against the nonsettling parties." *Id*. at 745. The nonsettling defendant, the contractor, brought suit arguing that the agreement was not in good faith. The court held that where "parties to a lawsuit settle 'in good faith before verdict or judgment' the settling tortfeasor is released from all liability for any contribution to any other tortfeasors and the claims against the nonsettling tortfeasors will be reduced by the amount of the contribution paid for the release of the settling tortfeasor." *Id*. at 747. The court stated that § 877 favors settlement and that to preserve the incentive to settle, " 'a plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury.' " *Id*. at 751 (quoting *Am. Motorcycle Ass'n v. Superior Court*, 20 Cal. 3d 578, 604 (Cal. 1978)). The court held that the plaintiff was entitled to an offset of the entire amount of the settlement and not just an amount attributable to his liability. *Id.* at 752.

**[15]** In this case, the settlings defendants agreed to settle with the trustee for the amount of $4.5 million. In the settlement agreement, the attorney defendants agreed to pay $3,075,000 and the directors agreed to pay $825,000 and $600,000. The agreement also provided that the trustee allocate the $3,075,000 to malpractice claims, and the directors' payments to forgiveness of promissory notes and repurchase of shares. In approving the settlement, the bankruptcy court reserved the right to find Tramiel a joint tortfeasor, which it did orally, and it found no stipulated good faith allocation given that the agreement merely recites that the trustee assigned the settlement to the non-joint claims. Although the settlement agreement does not allocate an amount of liability for Tramiel's harm, based on *Alcal*, Tramiel is entitled to an offset under § 877 of the entire settlement amount paid to the trustee. Thus, Tramiel is entitled to a settlement credit of $4.5 million. 8 Cal. App. 4th at 1127-28.

### E.    Director Preferences

**[16]**  Decker argues that the repayment of a $3 million loan plus interest in the amount of $40,201 to the Amber Group, consisting of several directors including Tramiel, was a per se illegal director preference under Delaware law. *See Pennsylvania Co. for Insurances on Lives & Granting Annuities v. South Broad St. Theatre Co.*, 174 A. 112, 116 (Del. Ch. 1934) (indicating impossibility of reconciling conduct of stockholders of a failing corporation who favor themselves as against creditors with honesty and good faith). However, *Penn. Co.* did not adopt a per se rule, and we believe there are special circumstances in this case that tip in favor of Tramiel as a director-creditor. Amber Group made the $3 million loan for a purpose not motivated by self-interest — to help JTS maintain operations while it negotiated a sale of intellectual property. The loan was secured by this intellectual property. When JTS sold the property of $5 million, it paid off the $3 million, while leaving JTS with $2 million more in revenue than it would have had — and with the purpose of the loan fulfilled. As a result, this was not an unlawful director preference.

### Conclusion

**[17]**  Accordingly, we hold that Tramiel's liability for the constructive fraudulent conveyance is $11.8 million, that this amount is reduced by $10,432,815 million because Tramiel is a good faith transferee under California Civil Procedure Code § 3439.08, and that Tramiel is entitled to a settlement credit of $4.5 million under California Civil Code § 877. Thus, Tramiel has no liability to the trustee for the conveyance.

**AFFIRMED**.